**WINTERLAND CONCESSIONS COMPANY, a California corporation, d/b/a Winterland Productions, Raindrop Products, Inc., a New York corporation, d/b/a Rolling Stones, Foghat Productions, Inc., a California corporation, d/b/a Foghat, 2001 Whitecastle Way, Ltd., a New York corporation, d/b/a Pat Benatar, Jefferson Starship, Inc., a California corporation, d/b/a Jefferson Starship, Sandi Productions, Inc., corporation of the District of Columbia, d/b/a Electric Light Orchestra, Tom Petty & the Heartbreakers, a partnership of California, The New Santana Band, Inc., a corporation of California, d/b/a Santana, Nightmare Productions, Inc., a California corporation, d/b/a Journey, REO Speedwagon, Inc., a California corporation, d/b/a REO Speedwagon, SBB, Inc., a Michigan corporation, d/b/a Bob Seger, Gimcastle Ltd., a New York corporation, d/b/a Black Sabbath, Blue Oyster Cult, Inc., a New York corporation, d/b/a Blue Oyster Cult, Grateful Dead Productions, Inc., a California corporation, d/b/a Grateful Dead, Amboy Dukes, Inc., a Michigan corporation, d/b/a Ted Nugent, Steady State, Inc., a California corporation, d/b/a Sammy Hagar, Aerosmith Productions, Inc., a California corporation, d/b/a Aerosmith, Fleetwood Mac Tours, a partnership of California, d/b/a Fleetwood Mac, Heart General Partnership, a partnership of Washington, d/b/a Heart, Music Makers, Inc., a California corporation, d/b/a the Doobie Brothers, and, Bruce Springsteen, an individual domiciled in New York, Plaintiffs,**

v.

**Emil R. SILEO and John Sileo, individually and d/b/a "Emo's T's", Larry Dickstein, individually, and d/b/a "T-Shirt Factory", Arnold Goldzweig, Allan Goldzweig, Yale Goldzweig, United Silk Screen, Inc., Barbara Soprych, Al Levin, Sanatex, Inc., Abraham H. Levin, Novelty Screen Printing, Inc., Billy Hamm and N & M Design, Inc., a/k/a N & M**

Novelty and Ed Trela, individually, d/b/a "Wissssh Designs" and d/b/a "Roc Rags", Defendants.

No. 81 C 5288.

United States District Court, N. D. Illinois, E. D.

Nov. 9, 1981.

As Corrected March 24, 1982.

Harold E. Wurst, Nilsson, Robbins, Dalgarn, Berliner, Carson & Wurst, Los Angeles, Cal., and Michael B. Roche, Hubachek & Kelly, Chicago, Ill., for plaintiffs.

Randolph A. Rifkin, James J. Zmigrocki of Anixter, Peck & Zmigrocki, Anthony Pacelli, Sheldon Davidson and Donald J. Moran of Pedersen & Houpt, Morris A. Haft, Chicago, Ill., for various defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

## HEARING ON MOTION FOR PRELIMINARY INJUNCTION

PERRY, Senior District Judge.

### I. *Introduction*

Plaintiff Winterland Concessions Company (hereinafter "Winterland") filed this civil action on September 21, 1981 against Emil R. Sileo, John Sileo and Larry Dickstein. The original complaint contained counts of Misappropriation of Right of Publicity, Violation of Illinois Deceptive Trade Practices Act and Violation of Section 43(a) of the Lanham Act. The complaint alleged that Winterland is an exclusive licensee of a number of entertainers and musical groups and produces shirts under the licenses bearing the names of the entertainers and musical groups. Further, the complaint alleged that the defendants Emil R. Sileo, John Sileo and Larry Dickstein were and are sellers of shirts bearing the names of Winterland's licensors without license or permission from those licensors.

On September 23, 1981, Judge Prentice H. Marshall of this Court, after hearing, entered a Temporary Restraining Order enjoining defendants Emil R. Sileo, John Sileo and Larry Dickstein from manufacturing, distributing, offering for sale or selling "upper body garments such as T-shirts and jerseys" bearing the names or appearances of any of the musical groups and entertainers who are the exclusive licensors of Winterland. In addition, the Temporary Restraining Order allowed Winterland certain expedited discovery.

On September 28, 1981, Winterland filed a First Amended Complaint adding as defendants Arnold, Allan and Yale Goldzweig. Counts of Misappropriation of Right of Publicity, Violation of Illinois Deceptive Trade Practices Act and Violation of Section 43(a) of the Lanham Act were added as to the Goldzweigs. The First Amended Complaint alleged that the Goldzweigs were, without permission or license, printing shirts bearing the name "Rolling Stones", an exclusive licensor of Winterland.

On September 28, 1981, Judge Prentice H. Marshall of this Court, after hearing, entered a Temporary Restraining Order enjoining the Goldzweigs from manufacturing, distributing, offering for sale or selling upper body garments bearing the names or likenesses of any of Winterland's exclusive licensors, including the group known as

"Rolling Stones". Further, the United States Marshal was ordered to seize material used by the Goldzweigs in the production of such upper body garments. Finally, expedited discovery was again ordered.

On October 16, 1981, Winterland filed a Second Amended Complaint, adding as defendants United Silk Screen, Inc., Barbara Soprych, Allen Levin, Sanatex, Inc. and Abraham H. Levin, (hereinafter "the Levin defendants") and Novelty Screen Printing, Inc., Billy Hamm and N & M Design, Inc. (hereinafter "the Hamm defendants"). The Second Amended Complaint alleged that the Levin defendants had served as the printers of unauthorized shirts to defendants Emil R. Sileo, John Sileo and Larry Dickstein. Further, the Second Amended Complaint alleged that the Hamm defendants had purchased from the Goldzweigs shirts bearing the names of two of Winterland's exclusive licensors, "Rolling Stones" and "Pat Benatar".

On October 16, 1981, Judge J. Sam Perry of this Court, after hearing, entered a Temporary Restraining Order as to the Levin defendants and the Hamm defendants. Those defendants were enjoined from manufacturing, distributing, offering for sale or selling upper body garments bearing the names or appearances of any of Winterland's exclusive licensors. Further, the Levin and Hamm defendants were ordered to not destroy or discard certain garments, business records or materials used in the production of certain garments. Further, the United States Marshal was ordered to seize from the Levin and Hamm defendants certain materials used in the production of shirts. Finally, expedited discovery was ordered.

On November 2, 1981, on motion, a Third Amended Complaint was filed. Twenty plaintiffs, the exclusive licensors of Winterland, were added. In addition, the Third Amended Complaint added as a defendant one Edward Trela. It was alleged that defendant Trela, d/b/a Wissssh Designs and d/b/a Roc Rags, is a printer of shirts bearing the names of certain of the plaintiffs without license or permission from the plaintiffs.

Following extensions of the several Temporary Restraining Orders entered in this case, a hearing on plaintiffs' Motion for Preliminary Injunction was held on November 5 and 6, 1981. After hearing the testimony in open court of eleven witnesses, after considering documentary and physical exhibits introduced into evidence and after considering the arguments of counsel, the Court enters the following Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## II. *Findings of Fact*

### A. *The Parties*

1. Plaintiff Winterland Concessions Company, doing business as Winterland Productions (hereinafter "Winterland") is a corporation of the State of California and has its principal place of business at 890 Tennessee Street, San Francisco, California.

2. Plaintiff Raindrop Products, Inc., doing business as the musical and entertainment group "Rolling Stones", is a corporation of the State of New York, and has its principal place of business at 66 Fifth Avenue, New York, New York.

3. Plaintiff Foghat Productions, Inc., doing business as the musical and entertainment group "Foghat", is a corporation of the State of California, and has its principal place of business at P.O. Box 398, Port Jefferson, New York.

4. Plaintiff 2001 Whitecastle Way, Ltd., doing business as the musical and entertainment group "Pat Benatar", is a corporation of the State of New York, and has its principal place of business at 1775 Broadway, Seventh Floor, New York, New York.

5. Plaintiff Jefferson Starship, Inc., doing business as the musical and entertainment group "Jefferson Starship", is a corporation of the State of California, and has its principal place of business at 2400 Fulton Street, San Francisco, California.

6. Plaintiff Sandi Productions, Inc., doing business as the musical and entertainment group "Electric Light Orchestra", is a

corporation of the District of Columbia, and has its principal place of business at 270 North Canon Drive, 3rd Floor, Beverly Hills, California.

7. Plaintiff "Tom Petty & The Heartbreakers" is a partnership of the State of California, and has a principal place of business at 9120 Sunset Boulevard, Los Angeles, California.

8. Plaintiff The New Santana Band, Inc., doing business as the musical and entertainment group "Santana", is a corporation of the State of California, and has its principal place of business at 201 Eleventh Street, San Francisco, California.

9. Plaintiff Nightmare Productions, Inc., doing business as the musical and entertainment group "Journey", is a corporation of the State of California and has its principal place of business at 2728 Union Street, San Francisco, California.

10. Plaintiff REO Speedwagon, Inc., doing business as the musical and entertainment group "REO Speedwagon", is a corporation of the State of California and has its principal place of business at 1046 Carol Drive, Los Angeles, California.

11. Plaintiff SBB, Inc., doing business as the musical and entertainment group "Bob Seger", is a corporation of the State of Michigan and has its principal place of business at 567 Purdy Avenue, Birmingham, Michigan.

12. Plaintiff Gimcastle, Ltd., doing business as the musical and entertainment group "Black Sabbath", is a corporation of the State of New York, and has its principal place of business at 888 Seventh Avenue, New York, New York.

13. Plaintiff Blue Oyster Cult, Inc., doing business as the musical and entertainment group "Blue Oyster Cult", is a corporation of the State of New York and has its principal place of business at 888 Seventh Avenue, New York, New York.

14. Plaintiff Grateful Dead Productions, Inc., doing business as the musical and entertainment group "Grateful Dead", is a corporation of the State of California and has its principal place of business at 90 Terra Dielo, San Raphael, California.

15. Plaintiff Amboy Dukes, Inc., doing business as the musical and entertainment group "Ted Nugent", is a corporation of the State of Michigan and has its principal place of business at 612 West Ganson, Jackson, Michigan.

16. Plaintiff Steady State, Inc., doing business as the musical and entertainment group "Sammy Hagar", is a corporation of the State of California, and has its principal place of business at 9229 Sunset Boulevard, Suite 625, Los Angeles, California.

17. Plaintiff Aerosmith Productions, Inc., doing business as the musical and entertainment group "Aerosmith", is a corporation of the State of New York, and has its principal place of business at 65 West 55th Street, New York, New York.

18. Plaintiff Fleetwood Mac Tours, doing business as the musical and entertainment group "Fleetwood Mac", is a California partnership, consisting of Mick Fleetwood, Stevie Nicks, Christine McVie, John McVie and Lindsey Buckingham, none of whom are residents or domiciliaries of the State of Illinois, and has its principal place of business at 1420 North Beechwood Drive, Hollywood, California.

19. Plaintiff Heart General Partnership, doing business as the musical and entertainment group "Heart", is a Washington partnership, consisting of Ann Wilson, Nancy Wilson, Stephen Fosseu, Howard Leese and Michael Derosier, none of whom are residents or domiciliaries of the State of Illinois, and has its principal place of business at P.O. Box 66558, Seattle, Washington.

20. Plaintiff Music Makers, Inc., doing business as the musical and entertainment group "The Doobie Brothers", is a corporation of the State of California, and has its principal place of business at 370 West Napa Street, Sonoma, California.

21. Plaintiff Bruce Springsteen, doing business under his own name as a musical entertainer, is an individual not resident or domiciled in the State of Illinois, and has a principal place of business at 136 East 57th Street, New York, New York.

22. Defendant Emil R. Sileo is an individual, a citizen of the State of Illinois, doing business as "Emo's T-Shirts". Until shortly before the beginning of this suit, defendant Emil R. Sileo resided at 6314 South Tripp, Chicago, Illinois.

23. Defendant John Sileo is an individual, a citizen of the State of Illinois, and is the son of defendant Emil R. Sileo. Until sometime prior to the beginning of this suit, defendant John Sileo resided at 6314 South Tripp, Chicago, Illinois.

24. Defendant Larry Dickstein ("Dickstein") is an individual, a citizen of the State of Illinois, doing business as "T-Shirt Factory", located at 1235 West Dundee, Buffalo Grove, Illinois. Dickstein is a resident of Des Plaines, Illinois.

25. Defendant Arnold Goldzweig is an individual, a citizen of the State of Illinois, residing at Apartment 45A, 1905 Grove, Mt. Prospect, Illinois. Defendant Arnold Goldzweig is a principal owner of Creative Screen Design, Inc., both of whom are defendants in Civil Action No. 80 C 5389, pending before Judge Will of this Court.

26. Defendant Allan Goldzweig is an individual, a citizen of the State of Illinois, residing at 9215 North Parkside Drive, Des Plaines, Illinois. With defendant Arnold Goldzweig, defendant Allan Goldzweig is a principal owner of Creative Screen Design, Inc., and is also a defendant in Civil Action No. 80 C 5389, pending before Judge Will of this Court.

27. Defendant Yale Goldzweig is an individual, and a citizen and resident of the State of Illinois. With defendants Arnold and Allan Goldzweig, defendant Yale Goldzweig is a principal owner of Creative Screen Design, Inc.

28. Defendant Ed Trela is an individual and a citizen and resident of the State of Illinois. Defendant Trela is a printer of shirts and is doing business as Wissssh Designs and Roc Rags.

29. Defendant United Silk Screen, Inc. (hereinafter "United"), is a corporation of the State of Illinois and has a principal place of business at 2321 North Wolcott Avenue, Chicago, Illinois.

30. Defendant Barbara Soprych is an individual, a citizen of the State of Illinois, resides in Illinois and is the President of defendant United.

31. Defendant Allen Levin is an individual, is a citizen of the State of Illinois, resides at 365 Ahwahnee Lane, Lake Forest, Illinois and is the Vice President of defendant United. Allen Levin owns all of the stock of defendant United and has since its incorporation.

32. Defendant Sanatex, Inc. ("Sanatex"), is a corporation of the State of Illinois and has its principal place of business at 2321 North Wolcott Avenue, Chicago, Illinois.

33. Defendant Abraham H. Levin is an individual, a citizen of the State of Illinois, resides in Skokie, Illinois, is the father of defendant Allen Levin and is the President of defendant Sanatex.

34. Defendant Novelty Screen Printing, Inc., is a corporation of the State of Illinois and has a principal place of business at 4240 Grove Avenue, Gurnee, Illinois.

35. Defendant Billy Hamm is an individual, is a citizen and resident of the State of Illinois and is a principal and a purchasing agent of defendant Novelty Screen Printing, Inc.

36. Defendant N & M Design, Inc., a/k/a N & M Novelty, is a corporation of the State of Illinois, having a principal place of business at 806 Peoria Street, Chicago, Illinois.

37. There is complete diversity of citizenship between all of the plaintiffs herein and all of the defendants. The matters in controversy herein exceed the sum or value of $10,000, exclusive of interest and costs.

### B. Injunctions Consented to By Certain Defendants

38. On October 19, 1981, defendants Arnold, Allen and Yale Goldzweig consented to entry herein of a Permanent Injunction. On October 20, 1981, the Court entered the Permanent Injunction as to those defendants, permanently restraining each of them

from manufacturing or selling upper-body garments bearing the names of twenty-two musical groups and entertainers, all exclusive licensors of Winterland.

39. On October 27, 1981, defendants Novelty Screen Printing, Inc., Billy Hamm, N & M Design, Inc., a/k/a N & M Novelty ("the Hamm defendants"), consented to entry herein of a Preliminary Injunction. On October 28, 1981, the Court entered the Preliminary Injunction as to the Hamm defendants.

40. On November 10, 1981, the Court was advised that defendants United Silk Screen, Inc., Barbara Soprych, Allen Levin and Abraham H. Levin ("the Levin defendants") did not oppose entry of a Permanent Injunction. Based on this consent, the Court has entered a Permanent Injunction as to the Levin defendants. Plaintiffs have filed a Dismissal Without Prejudice Under Rule 41(a) as to the Levin defendants and Sanatex, Inc.

41. On November 5, 1981, the first day of hearing of plaintiffs' Motion for Preliminary Injunction, the Court was advised that defendants Emil R. Sileo and Larry Dickstein consented to the entry of a Preliminary Injunction as to them.

### C. *Issues Tried at Hearing on Motion For Preliminary Injunction*

42. Plaintiffs have been unable to obtain personal service on defendant John Sileo, the son of Emil R. Sileo, and his present whereabouts are unknown to plaintiffs and the Court. Plaintiffs have alleged that defendants Emil R. Sileo and John Sileo have been in effect operating the business known variously as "Emo's T's" and "Emil" as a partnership. As such, it is alleged by plaintiffs that this Court may issue process to and obtain jurisdiction over defendant John Sileo by service on defendant Emil R. Sileo pursuant to Rule 4(d)(7), Federal Rules of Civil Procedure and Section 13.4, Illinois Revised Statutes, Chapter 110. Thus, an issue tried at the hearing was the nature of the business of Emil R. Sileo and John Sileo and the participation of each in that business.

43. Process was served on defendant Ed Trela, d/b/a Wissssh Designs and Roc Rags, and this Court has jurisdiction over him. Trela defended against the Motion for Preliminary Injunction on constitutional grounds and the Court considered the issues raised thereby.

44. As to defendants John Sileo and Ed Trela, a further issue tried at the Hearing on Preliminary Injunction was plaintiffs' right to the affirmative relief sought.

### D. *Winterland's Business*

45. Winterland is engaged in the business of manufacturing, distributing and selling T-shirts and jerseys bearing the names, likenesses, logos and symbolic designs of individual performers and musical groups. Winterland purchases blank T-shirts and jerseys and, using a well-known silk screen process, imprints the names, logos and designs on the T-shirt or jersey material.

46. Winterland sells the T-shirts and jerseys imprinted with the names of the entertainers and musical groups through retail outlets and on the premises of concerts of the musical groups and entertainers. The ratio between Winterland's retail sales and concert sales is that sales at concerts compromises about 90% of the total and sales at retail about 10%.

47. When sales of the Winterland imprinted shirt products are made at concerts, the facilities at which the sales occur retain a portion of the income. The percentage of the income retained varies between concert halls but may be as much as forty percent of gross sales of the licensed shirts.

48. From the money remaining after payment to the concert hall, royalties are paid to the entertainer or group and Winterland retains the remainder as its income.

49. Winterland's total sales of licensed shirts in the twelve months preceding the Hearing were about fifteen million dollars. Of that amount, about sixty five percent were from sales of shirts bearing the names or marks of the other plaintiffs in this case.

50. In the twelve months prior to the Hearing, Winterland paid about three million dollars in royalties to the entertainers and groups who are co-plaintiffs herein for the rights to imprint shirts using their names and marks. In the same twelve months, Winterland paid about three million dollars to the concert halls where concerts were held by the entertainers and groups who are co-plaintiffs.

51. In the twelve months prior to the Hearing, Winterland made and sold shirts bearing the names and/or marks of each of the other plaintiffs in this case and has paid money to each for the right to make and sell said shirts.

### E. The Other Plaintiffs

52. Each of the other twenty plaintiffs in this case are entities who own the name and marks of the named entertainers and musical groups. Each has exclusively licensed to Winterland rights to use their name and marks on the shirts produced by Winterland.

### F. Winterland's License Agreements

53. Winterland has an agreement with each of the co-plaintiffs in this case which includes an exclusive license to utilize the group's or entertainer's name, logo and designs on imprinted T-shirts and jerseys. For example, co-plaintiff 2001 White Castle Way, Inc., owner of the rights to the name and marks of the entertainer Pat Benatar, has a written agreement with Winterland which includes the following recitation:

"* * * you and we agree that Licensor shall and hereby does grant WINTER-LAND * * * the exclusive right in the United States * * * and Canada to utilize the name, symbols, emblems, designs, trademarks, and/or service marks, likennesses and visual representations of Licensor * * * (1) in connection with the manufacture, advertisement, distribution and/or sale of merchandise * * * in, around, and at each concert site at which the musical performing group with the distribution, advertisement, and/or sale of upper body garments (t-shirts, jerseys, etc.)"

The written agreement quoted above was entered into evidence as plaintiffs' Exhibit No. 3.

### G. The Bootleg Shirt Problem

54. Several of the witnesses called by plaintiffs defined and used the term "bootleg" as applied to the circumstances underlying this case. Based on that testimony, the Court defines the word "bootleg", as applied to the licensed imprinted shirt industry, as referring to the imprinting, production or sale of shirts bearing the names and marks of entertainers and/or musical groups without permission or license from those entertainers or groups.

55. With only a few exceptions, Winterland sells its licensed shirts at concerts within the confines of a concert hall or auditorium. Generally, two types of licensed shirts are sold, T-shirts and jerseys. Licensed T-shirts are generally sold at concerts by Winterland for eight or nine dollars. Licensed jerseys are generally sold for twelve or thirteen dollars.

56. Bootleg shirts are generally produced by unknown printers. Usually using blank cotton shirts imported from Pakistan, the printers silk screen onto the shirts the names and trademarks of entertainers or groups on tour. The imprinted bootleg shirts are then sent, often by air freight, to individuals who follow the tours of various entertainers or entertainment groups, including those who are party plaintiffs in this action.

57. Bootleg shirts are generally sold by vendors outside the concert halls in streets and parking lots. Usually, the bootleg shirts and jerseys are sold for a price slightly less than the licensed shirts sold inside the hall or auditorium, though on some occasions, the prices have been the same.

58. As part of an enforcement program, Winterland and many of the entertainers and groups who are co-plaintiffs in this case have obtained over one hundred seizure orders at concert sites around the United States.

### H. *The Sileo Shirt Business*

59. Plaintiffs called Mrs. Violet Himley, a former secretary and bookkeeper for Creative Screen Design, Inc. ("Creative") owned by defendants Arnold, Allan and Yale Goldzweig. Mrs. Himley testified that Creative maintained records in code of all of its sales of shirts. Plaintiffs introduced (Exhibit 7) a copy of Creative's code list, which contained a code designation for each of the entertainers and groups involved in this case. For example, the code designation for "Rolling Stones" was "hhhh"; for "Journey", "WW"; for "REO Speedwagon", "E"; and, for "Fleetwood Mac", "Z".

60. Mrs. Himley identified and plaintiffs entered (Exhibit 9) a ledger maintained by Creative showing coded sales, by customer, of bootleg shirts from October 1, 1979 to September 30, 1980. One of the customers listed in the ledger is "Emo's T's". Mrs. Himley identified "Emo's T's" as the account of defendants Emil R. Sileo and John Sileo. Mrs. Himley identified Emil R. Sileo in Court.

61. Mrs. Himley testified that she had seen Emil R. Sileo on many occasions and John Sileo on a few occasions present at Creative. On at least one occasion, she was given cash by Emil R. Sileo which was applied against the account of "Emo's T's".

62. Referring to the code list (Exhibit 7) and the ledger (Exhibit 9), Mrs. Himley identified the following partial sales of bootleg shirts by Creative to Emil R. Sileo and John Sileo:

| Date | Name on Shirt | Quantity | Price |
|---|---|---|---|
| April 29, 1980 | Cheap Trick | 15 dozen | $   540.00 |
| May 6, 1980 | REO Speedwagon | 30 dozen | $   906.00 |
| July 10, 1980 | Foghat | 72 dozen | $ 1,848.00 |
| July 22, 1980 | Foghat | 72 dozen | $ 1,848.00 |
| July 24, 1980 | Foghat | 60 dozen | $ 1,650.00 |
| August 5, 1980 | Black Sabbath | 70 dozen | $ 1,716.00 |
| August 5, 1980 | AC/DC | 96 dozen | $ 2,640.00 |
| August 7, 1980 | Fleetwood Mac | 12 dozen | $   396.00 |
| August 19, 1980 | Grateful Dead | 56 dozen | $   684.00 |
| September 4, 1980 | Black Sabbath | 12 dozen | $   264.00 |
| September 17, 1980 | Bob Seger | 12 dozen | $   408.00 |
| October 2, 1980 | Blue Oyster Cult | | $   828.00 |

63. In total, according to Creative's ledger (Exhibit 9) and subsequent ledger cards (Exhibit 10), Emil R. Sileo and John Sileo purchased bootleg shirts from Creative on 88 occasions between April 29, 1980 and March 23, 1981.

64. Creative's ledger listed payments by Emil R. Sileo and John Sileo to Creative. In each instance, the payments were in cash. During September, 1980, Emil R. Sileo and John Sileo paid Creative cash on thirteen occasions for a total in excess of $27,000.

65. In October, 1980, Judge Hubert Will of this Court entered a Preliminary Injunction enjoining Creative's printing of shirts bearing the names of fifteen of the groups involved in this case.

66. In about March, 1981, defendant Larry Dickstein arranged a meeting between defendants Emil R. Sileo and John Sileo and defendant Allen Levin on the premises of defendant United Silk Screen, Inc. in Skokie, Illinois. At that meeting, Levin agreed to print bootleg shirts for defendants Emil R. Sileo and John Sileo through the facilities of defendant United.

67. Defendants Emil R. Sileo and John Sileo obtained blank shirts imported from Pakistan from A & G, Inc. Plaintiffs called Rauf Gajiani, the president of A & G, Inc., who testified under subpoena. A & G and Gajiani produced invoices from the records of A & G which were identified by Gajiani as reflecting sales to defendants Emil R. Sileo and/or John Sileo.

68. Some of the invoices introduced listed no purchaser. One listed John Sileo as the purchaser. One listed "Emmil" of "Chicago" as the purchaser. Several listed "Secret Agent Productions" as the purchaser. Several listed "George E." as the purchaser, who Gajiani identified as John Sileo.

69. The total purchases from A & G, Inc. of blank shirts by Emil R. Sileo and/or John Sileo shown by the A & G invoices (Exhibits 12, 13, 14 and 15) were 58,776 shirts for a total of $69,046.00.

70. Richard Carnahan, employed by Emil R. Sileo and/or John Sileo, in the period March, 1981 to about September, 1981, transported blank shirts from A & G, Inc. to defendants Levin and United Silk Screen in the following fashion:

    a. Blank shirts, in the form of bales of 24 dozen each, were obtained from A & G, Inc., at one of several locations;

    b. Richard Carnahan and/or John Sileo transported the bales of blank shirts to the premises of defendant Sanatex, 2321 North Wolcott Avenue, Chicago. Sanatex, is owned by Allen Levin's father, defendant Abraham H. Levin. Carnahan testified that he made over 50 such trips;

    c. At Sanatex, the bales of blank shirts were off-loaded to either another truck or on to the loading dock of Sanatex;

    d. From Sanatex, the bales of blank shirts were taken to a printing location, to be silk screened, by either defendant Allen Levin or an employee of Allen Levin;

    e. From late June or early July, 1981, until this suit began, the printing location was maintained as a secret by Allen Levin. Richard Carnahan testified that he did not know the location; Allen Levin testified that he kept the location secret from Emil R. Sileo and John Sileo. Levin testified that his purpose in keeping the printing location secret was to frustrate enforcement efforts by owners of the names and marks used, such as the plaintiffs in this case;

    f. From late June or early July, 1981, until this suit began, the secret printing location was on the premises of American Waste and Wiper Company, 735 West Division Street, Chicago, Illinois. American Waste and Wiper is owned by an uncle of defendant Allen Levin.

    g. From late June or early July, 1981, defendant Levin printed bootleg shirts for Emil R. Sileo and John Sileo at the secret location on an automatic print machine owned by another of Allen Levin's companies, Survivor Screen Print, Inc.; and,

    h. After the blank shirts were silk screened by defendant Levin, they were boxed and returned by him to the Sanatex facility where they were picked up by Richard Carnahan or John Sileo.

71. Richard Carnahan testified that he had transported or sold shirts for Emil R. Sileo while in his employ bearing at least the following names of the groups and entertainers involved in this suit:

| | |
|---|---|
| JOURNEY | REO SPEEDWAGON |
| BOB SEGER | BLACK SABBATH |
| BLUE OYSTER CULT | HEART |
| DOOBIE BROTHERS | TOM PETTY |
| CHEAP TRICK | TED NUGENT |
| PAT BENATAR | |

72. Allen Levin testified that he printed for Emil R. Sileo and John Sileo shirts bearing the names of the following groups and entertainers involved in this suit:

| | |
|---|---|
| JOURNEY | REO SPEEDWAGON |
| PAT BENATAR | BLUE OYSTER CULT |
| DOOBIE BROTHERS | TOM PETTY |
| ROLLING STONES | CHEAP TRICK |
| FLEETWOOD MAC | HEART |
| TED NUGENT | FOGHAT |

73. Allen Levin testified that after Emil R. Sileo and John Sileo were sued herein but before he was sued, he destroyed all artwork, film and silk screens he had used in printing shirts for Emil and John Sileo. Further, he testified that he never kept written records of his transactions with Emil R. Sileo and John Sileo.

74. John Sileo made more deliveries of blank shirts to Sanatex than did Richard Carnahan. John Sileo made more pick-ups of printed bootleg shirts at Sanatex than did Richard Carnahan.

75. After the boxes of bootleg shirts were picked up by Richard Carnahan from Sanatex, they were taken by him in most instances to O'Hare Airport or Midway Airport. There they were sent by air freight to various destinations around the country.

76. At the airports, Richard Carnahan would either fill out an Air Bill or use an Air Bill which was provided him by Emil R. Sileo to ship the bootleg shirts. Carnahan testified that he believed that the names of the consignees on the Air Bills were generally false. Carnahan further testified that he never saw an Air Bill with the name Emil R. Sileo as the shipper. Carnahan further testified that most air bills bore fictitious names, usually "T. Mix", as the shipper but would bear the home address of Emil R. Sileo, that is, 6314 South Tripp, Chicago.

77. Plaintiffs introduced an Air Bill (Exhibit 5) dated May 23, 1981, which sent two cartons of 98 pounds of "clothing" to "T. Scot, Hold for Pick Up, Pittsburgh". The shipment was sent collect. The shipper is listed on Exhibit 5 as "D. Madea, 6314 South Tripp, Chicago, Illinois". Diane Madea is the married name of Emil Sileo's sister. The listed address, 6314 South Tripp, was, at that time, the home address of Emil R. Sileo.

78. Plaintiffs introduced three United Airlines Air Bills (Exhibit 6) obtained from Richard Carnahan. Each is to "C. Weber, Hold for Pickup, Boise, Idaho". Each lists the shipper as "T. Mix, 6314 South Tripp, Chicago".

79. Carnahan also delivered shirts on behalf of Emil R. Sileo to defendant Larry Dickstein on at least two occasions.

80. Carnahan testified that John Sileo "ran a crew", that is, employed others to sell bootleg shirts under his direction at concerts. John Sileo was seen by Carnahan on several occasions returning to Chicago with a briefcase containing cash. Carnahan participated on several occasions in counting the returned cash, usually in the kitchen of the Sileo house at 6314 South Tripp. Many thousands of dollars in cash would be counted.

81. Plaintiffs called Mary Carnahan, who is the sister of Emil Sileo's wife. Mary Carnahan was employed as a waitress for about one month in April, 1981. Except for that one month, Mary Carnahan has not been employed since March, 1981. Plaintiffs introduced a checkbook of Mary Carnahan's (Exhibit 19) relating to a checking account maintained in her name at the Republic Bank of Chicago. During the approximate period of July 3, 1981 to July 16, 1981, Mary Carnahan wrote five checks (Exhibits 20–23) to Emil R. Sileo totalling $11,961.00. Mary Carnahan testified that the checks were to return sums to Emil R. Sileo which he paid to her.

82. Plaintiffs entered fourteen checks (Exhibit 16) drawn on a checking account maintained at the Marquette National Bank account in the name of Secret Agent Productions, 6314 South Tripp, Chicago, the home address of Emil R. Sileo and John Sileo. Eight of the checks were signed by Emil R. Sileo; six were signed by John Sileo. The earliest check was dated March 3, 1981; the latest April 6, 1981. Each check was written to "cash", for a total of $24,522.00. Each was endorsed "For Deposit Only, A & G".

83. a. According to Richard Carnahan, he was employed by Emil R. Sileo, paid by Emil R. Sileo and received most of his instructions from Emil R. Sileo. Richard Carnahan testified that John Sileo transported blank shirts to defendant Levin and picked up bootleg shirts from defendant Levin and that John Sileo "ran a crew".

b. Violet Himley testified that she saw Emil R. Sileo and John Sileo at Creative Screen Design but that Emil R. Sileo was there on more occasions than John.

c. Rauf Gajiani of A & G, Inc. testified that he dealt more often with John Sileo than Emil R. Sileo.

d. Allen Levin, the printer of bootleg shirts, testified that he dealt with both Emil R. Sileo and John Sileo but that he dealt more often with John Sileo.

e. Kathleen Sileo, Emil R. Sileo's wife and John Sileo's stepmother, testified that the T-shirt business was John's and Emil "just helped out".

f. Richard Carnahan testified that he had been often told by Emil R. Sileo that if he were ever "busted", he should say that the business was John Sileo's, not Emil Sileo's.

g. Emil R. Sileo testified under subpoena and, except as to his name and home address, invoked the Fifth Amendment as to all areas of interrogation.

84. Based on all the evidence, the Court finds that the business of selling shirts, at least some of which were bootleg, was a business jointly operated by Emil R. Sileo and his son John Sileo; that the business was variously known "Emo's T's" and "Secret Agent Productions"; that each of these defendants issued orders for goods on behalf of the business; that each of them made payments for goods on behalf of the business; that both of them were signatories on at least one business bank account of Secret Agent Productions; that each of them performed tasks to advance the interests of the business. Emil R. Sileo and John Sileo are, therefore, partners in the operation of their shirt business, including their bootleg shirt business, and, as such, are subject to service pursuant to Section 13.4, Illinois Revised Statutes, Section 110.

### I. The Attachment Ordered By The Court

85. On October 16, 1981, plaintiffs filed, under Rule 64 of the Federal Rules, a Motion for Issuance of Writ of Attachment as to an account of Emil R. Sileo at Prospect Federal Savings & Loan, Chicago, in the approximate amount of $63,000. The Writ of Attachment was granted under the Attachment statute of the State of Illinois.

### J. The Trela Shirt Business

86. Ed Trela is the sole owner and operator of a business named "Wissssh Designs", Chicago. Trela is a printer, by silk screen process, of shirts. Trela appeared *pro se.*

87. Plaintiffs introduced (Exhibit 18) invoices of blank shirts sold to Ed Trela by A & G, Inc. The total sales shown by those invoices is 27,768 shirts for a total of $30,-537.

88. In his testimony, Trela admitted that before October 1, 1981, he had printed and sold shirts bearing the following names of entertainers and musical groups involved in this case:

| | |
|---|---|
| JOURNEY | ROLLING STONES |
| REO SPEEDWAGON | AEROSMITH |
| BLACK SABBATH | CHEAP TRICK |
| BLUE OYSTER CULT | FLEETWOOD MAC |
| DOOBIE BROTHERS | GRATEFUL DEAD |
| BRUCE SPRINGSTEEN | TED NUGENT |
| ELECTRIC LIGHT ORCHESTRA | SAMMY HAGAR |
| SANTANA | FOGHAT |

89. Trela testified that on or about October 1, 1981, he began to print newspapers rather than T-shirts. One such item (Exhibit 25) was printed on a jersey imported from Pakistan.

On the front is printed:

a. In letters nearly three inches high, the words "Blue Oyster Cult";

b. In letters three-sixteenths of an inch high, the legend "if the news fits wear it";

c. In letters about one-half inch high, five phrases, among which are "A classic Rock Halloween Party, O My God", "WMET: Chicago's Most Popular Rock Station!!" and "Rolling Stones: World's Greatest Rock Band!!"; and,

d. In letters about three-sixteenths of an inch high, the legend "Chi & Burbs $7.00. The World's First Rock Concert Newshirt Roc Rag 10–16–81 Page 1."

On the back is printed:

a. In letters two and one-half to four and one-half inches high, the word "Foghat";

b. In letters about five-sixteenths of an inch high, the legend "British Blues Rock Band Returns to Chicago As Warm Up Act For B.O.C. October 16th at the Amp.";

c. In letters about five-sixteenths of an inch high, an item in two lines about "Foghat's Newest Album ... Typical Foghat Music";

d. In letters about five-sixteenth of an inch high, an item in four lines about "drug" problems and solutions;

e. A circular space one and three-quarters inches wide contained the legend "This space available contact Roc Rag";

f. A November "Concert Calendar" measuring two and one-half inches by six inches;

g. In one-sixteenth inch print, the legend "Vol. 1 No. 2 Roc Rag Copyright 1981. All rights reserved. No part of this publication may be reproduced in any form or by any means without permission in writing from the publisher. Roc Rag P.O. Box 634, Oak Lawn, Illinois 60454 10–16–81 Page 2."

90. Trela testified that the "newspapers" like Exhibit 25 had been produced by him for sale outside a concert in Chicago of "Blue Oyster Cult" and "Foghat".

91. The claimed "news events" notwithstanding, the dominant features of Trela's "newspaper" of Exhibit 25 are that it is a shirt with "Blue Oyster Cult" on the front and "Foghat" on the back.

92. Trela's "newspapers" are bootleg shirts.

93. Any Conclusion of Law deemed to be a Finding of Fact is included as a true Finding herein.

### III. CONCLUSIONS OF LAW

A. This Court has jurisdiction over the subject matter of this litigation in view of the Federal question raised by the counts based upon Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), 15 U.S.C. § 1121, 28 U.S.C. § 1338(a). Further, in view of the complete diversity between all plaintiffs and all defendants, and in view of the matter in controversy exceeding the sum or value of $10,000, this Court also has jurisdiction of the subject matter under 28 U.S.C. § 1332(a).

B. All party defendants, except John Sileo, have appeared herein and the Court has personal jurisdiction over them.

■ C. The Federal Rules of Civil Procedure provide that process may be served in any manner prescribed by the laws of this State. Rule 4(d)(7), Federal Rules of Civil Procedure. Section 13.4 of the Illinois Civil Practice Act, Chapter 110, § 13.4 *Ill. Rev.Stat.*, provides that service on a partner may be effected by service on any other partner. Accordingly, this Court holds, as a matter of law, that Emil R. Sileo and John Sileo operated their bootleg shirt business as a partnership and that this Court may acquire jurisdiction over John Sileo by service of process on Emil R. Sileo.

■ D. One of the species of the right of privacy recognized by the cases and the commentators is the right of publicity. Violation of this right constitutes the tort of appropriation of a plaintiff's name or likeness for defendant's benefit. In the context of this case, the right of publicity encompasses the right of each of the plaintiff entertainers and musical groups to have the sole right to commercially exploit their name and likeness. *Haelan Laboratories v. Topps Chewing Gum*, 202 F.2d 866 (CA 2 1953); *Factors Etc., Inc. v. Pro Arts, Inc.*, 579 F.2d 215, 220 (CA 2 1978); *Martin Luther King, Jr. Etc. v. American Her.*, 508 F.Supp. 854, 862 (N.D.Ga.1981); W. Prosser, *Torts*, 804 (4th ed. 1971).

E. The Supreme Court considered the right of publicity in *Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562, 97 S.Ct. 2849, 53 L.Ed.2d 965 (1977) and held:

"The rationale for [protecting the right of publicity] is the straightforward one of preventing unjust enrichment by the theft of good will. No social purpose is served by having the defendant get free some aspect of the plaintiff that would have market value and for which he would normally pay". (at 576 of 433 U.S., 97 S.Ct. at 2857)

■ F. The Court holds that unauthorized and unprivileged printing on shirts of the names, trademarks and/or likenesses of the plaintiff entertainers and musical groups herein constitutes a violation of the right of publicity of each of those entertainers and groups.

G. The right of publicity may be legally and validly transferred from the plaintiff entertainers and musical groups to plaintiff Winterland Concessions Company. *Factors Etc., Inc. v. Pro Arts, Inc.*, 579 F.2d 215 (CA 2 1978); *Factors Etc., Inc. v. Creative Card Co.*, 444 F.Supp. 279 (S.D.N.Y. 1977); *Winterland Concessions Co., et al. v. Creative Screen Design, Ltd., et al.*, 210 U.S.P.Q. 6 (N.D.Ill.E.D.1980).

H. The court holds that, as of the date of the Hearing, Winterland Concessions Co. had been exclusively licensed with the right to print on shirts the names, trademarks and/or likenesses of the following entertainers and groups:

ROLLING STONES
PAT BENATAR
ELECTRIC LIGHT ORCHESTRA
SANTANA
REO SPEEDWAGON
BLACK SABBATH
GRATEFUL DEAD
SAMMY HAGAR
FLEETWOOD MAC
THE DOOBIE BROTHERS
FOGHAT
JEFFERSON STARSHIP
TOM PETTY AND THE HEARTBREAKERS
JOURNEY
BOB SEGER
BLUE OYSTER CULT
TED NUGENT
AEROSMITH
HEART
BRUCE SPRINGSTEEN

I. The court holds that unauthorized and unprivileged printing on shirts of the names, trademarks and/or likenesses of the entertainers and groups identified in the previous Conclusion is a violation of rights of publicity owned by plaintiff Winterland Concessions Company.

J. Edward Trela, d/b/a "Wissssh Designs" and d/b/a "Roc Rags", has raised as a defense the First Amendment privilege of freedom of the press. The Court has found, as a matter of fact, that, contrary to Trela's claim, his products are not newspapers but are shirts (Finding No. 92). As such, the privilege of Freedom of the Press does not extend to his activities. Moreover, as a matter of law, the First Amendment "is not a license to trammel on legally recognized rights in intellectual property". *Dallas Cowboys Cheerleaders v. Scoreboard Posters*, 600 F.2d 1184, (CA 5 1979); *Ali v. Playgirl, Inc.*, 447 F.Supp. 723, 727 (S.D.N.Y.1978).

K. The court holds that the shirt products of Trela, both after October 1, 1981, when he claims to have started printing "newspapers", and before, constitute violations of the rights of plaintiffs in this case.

L. The names of the entertainers and musical groups involved in this case are famous in the music industry. There is nothing in the record of this case to suggest that any of the names are trademarks or service marks registered under the Lanham Act. In order to support the action in this case under Section 43(a) of the Lanham Act, however, it is not necessary that the marks in question be registered. *L'Aiglon Apparel, Inc. v. Lana Lobell, Inc.*, 214 F.2d 649 (CA 3 1954); *General Pool Corp. v. Hallmark Pool Corp.*, 259 F.Supp. 383 (N.D. Ill.E.D.1966); *Iding v. Anaston*, 266 F.Supp. 1015 (N.D.Ill.E.D.1967); *Winterland Concessions Co., et al. v. Creative Screen Design, Ltd., et al.*, 210 U.S.P.Q. 6 (N.D.Ill.E.D.1980).

M. The court holds that the unauthorized printing of shirts bearing the names, trademarks and/or likenesses of the plaintiff entertainers and musical groups herein violates the rights of all plaintiffs herein under Section 43(a) of the Lanham Act, 17 U.S.C. § 1125(a).

N. Emil R. Sileo, a principal defendant in this case, testified and, except for his name and address, refused to respond to questions from plaintiffs' counsel, invoking his Fifth Amendment privilege against self-incrimination. (Finding No. 83(g)).

O. There is no doubt that a defendant may invoke the protection of the Fifth Amendment in a civil matter. The standard for the application of the Fifth Amendment privilege is found in *Hoffman*

*v. United States,* 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118 (1951), which holds:

"The privilege afforded not only extends to answers that would in themselves support a conviction under a federal criminal statute but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute...."

■ P. However, in a civil case, adverse evidentiary inferences may be drawn against a party who refuses to testify by invoking his Fifth Amendment privilege. An adverse inference may be drawn that the testimony of a witness claiming the Fifth Amendment would have been incriminating in all ways suggested by any other evidence. *Baxter v. Palmigiano,* 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976); *Local 167 I.B.T., Etc. v. U. S.,* 291 U.S. 293, 54 S.Ct. 396, 78 L.Ed. 804 (1934).

Q. There is a three part test in weighing the propriety of the issuance of a preliminary injunction. First, it must appear substantially likely that plaintiffs will succeed at the trial on the merits. Secondly, the harm to plaintiff must be shown to be irreparable. Thirdly, it must be determined that the damage to the plaintiff in the absence of an injunction outweighs the foreseeable harm to the defendants if the injunction is granted. *Moore's Federal Practice,* § 65.04. In this case, these factors weigh heavily in favor of the issuance of preliminary injunctions against all defendants.

■ R. Preliminary injunctions shall issue against all defendants except Sanatex, Inc.

S. Any Finding of Fact deemed to be a Conclusion of Law is included herein.