FACTORS ETC., INC. and Boxcar Enterprises Inc., Plaintiffs-Appellees,

v.

PRO ARTS, INC. and Stop and Shop Companies, Inc., Defendants-Appellants.

No. 655, Docket 77–7544.

United States Court of Appeals, Second Circuit.

Argued May 8, 1978.

Decided June 27, 1978.

Raymond E. Scott, Detroit, Mich. (Ralph T. Rader, Burke, Va., Cullen, Settle, Sloman & Cantor, Detroit, Mich., Kane, Dalsimer, Kane, Sullivan & Kurucz, Joseph C. Sullivan, and John F. Boyle, New York City, of counsel), for defendants-appellants.

Michael C. Silberberg, New York City, and Arthur Fields, Beverly Hills, Cal. (Ervin, Cohen & Jessup, Beverly Hills, Cal., of counsel and Golenbock & Barell, New York City), for plaintiffs-appellees.

Before WATERMAN, INGRAHAM * and MANSFIELD, Circuit Judges.

INGRAHAM, Circuit Judge:

Plaintiffs-Appellees, Factors Etc., Inc. (Factors) and Boxcar Enterprises, Inc. (Boxcar), sued Defendants-Appellants, Pro Arts, Inc. (Pro Arts) and Stop and Shop Companies, Inc. (Stop and Shop), for injunctive relief and damages based upon defendants' alleged misappropriation and unauthorized use of the name and likeness of Elvis Presley (Presley). The trial court granted the plaintiffs' preliminary injunction upon its findings that the exclusive right to market Presley memorabilia survived the death of Presley, and the Presley poster printed by defendants allegedly in derogation of this right was not privileged as the publication of a newsworthy event. This is an interlocutory appeal pursuant to 28 U.S.C. § 1292(a)(1).

Because the facts are not in dispute, we need not describe them in detail. During Presley's career as an entertainer, Colonel Tom Parker (Parker) served as his close friend, mentor and personal manager. This professional relationship between the two parties began on March 26, 1956, with the execution of the first contract between them. Parker immediately began the task of creating the "Elvis persona." In so doing, both he and Presley capitalized upon the marketing of merchandise bearing the Elvis name and likeness. Parker directed this effort until Presley's death, a task reflected by the numerous extensions of the contract between the two parties.[1]

---

* Of the United States Court of Appeals for the Fifth Circuit, sitting by designation.

1. At the time of his death, Presley was operating under an agreement with Parker, who was doing business as "All Star Shows." The

Boxcar Enterprises, a Tennessee corporation controlled by Presley and Parker,[2] was the vehicle through which the commercial Elvis Presley rights were marketed. Boxcar sublicensed other companies to do the actual manufacturing and distributing of each specific item, receiving royalties from the sales.[3]

On August 16, 1977, Elvis Presley died suddenly and unexpectedly. His father, Vernon Presley, was appointed executor of his estate. On August 18, 1977, two days after Presley's death, Boxcar granted Factors the exclusive license to exploit commercially the name and likeness of Elvis Presley. Factors paid Boxcar $100,000 on execution of the agreement against a guarantee of $150,000. Vernon Presley, as executor of the estate, signed the agreement licensing Factors, at the same time warranting that Boxcar was the sole and exclusive owner of the commercial Elvis Presley rights.[4] The agreement was also approved by Parker.

Immediately following Presley's death, Pro Arts decided that it too wanted a share in the market for Elvis Presley memorabilia. It purchased the copyright in the photograph of Presley from a staff photographer of the Atlanta (Georgia) Journal. On August 19, 1977, three days after his death, Pro Arts published a poster using the photograph and filed an application for registration of copyright. The poster is entitled "IN MEMORY" and below the photograph of Presley the poster bears the dates "1935–1977."

On the same day that the poster was published, Pro Arts began to market it. One of its first customers was co-defendant Stop and Shop Companies, which thereafter sold the poster through its Bradlees Stores Division in the Southern District of New York. On August 24, 1977, five days after its poster was placed on the market, Pro Arts notified Boxcar Enterprises that it was offering "a memorial 'Elvis' poster to meet the public demand." When Factors was informed of the letter, it replied to Pro Arts claiming the exclusive right to manufacture, sell and distribute all merchandise utilizing the name and likeness of Elvis Presley. Factors also warned Pro Arts that if it did not discontinue sale of the poster, it would be subject to a lawsuit for injunctive relief, damages and an accounting.

Instead of ceasing distribution of the poster, Pro Arts filed suit in the United States District Court for the Northern District of Ohio seeking a declaratory judgment of non-infringement of the rights claimed by Factors. When Factors discovered that it had been sued in Ohio, it responded by instituting this action against Pro Arts and Stop and Shop in United States District Court for the Southern District of New York.[5] This later action was filed on September 26, 1977, just five days after Pro Arts' action.

Upon the filing of the complaint in this action, the district judge entered an "order to show cause" requiring Pro Arts to show cause why an injunction should not issue against it. Pro Arts responded with a motion to dismiss, stay or transfer the suit to the Northern District of Ohio. On October 13, 1977, the New York court filed an opinion and order of preliminary injunction against Pro Arts. The injunction re-

---

agreement was executed on May 25, 1963, and was thereafter extended several times. The last extension occurred on January 22, 1976, and granted merchandising rights to Parker for another seven years.

2. Parker owned 56% of the shares; Presley and Tom Dishkin, President of Boxcar, each owned 22%.

3. When Boxcar licensed a merchandising item, Presley received 20% of the royalties, Parker received 20%, and Dishkin received 10%. The remaining 50% went to Boxcar.

4. Contemporaneous with this agreement, Vernon Presley wrote to Parker, asking him to "carry on according to the same terms and conditions as stated in the contractual agreement [between Presley and Parker] dated January 22, 1976" (See n. 1, *supra*).

5. Jurisdiction was predicated upon the diversity of citizenship between the parties. 28 U.S.C. § 1332.

strained Pro Arts during the pendency of the action from manufacturing, selling or distributing (1) any more copies of the poster labeled "IN MEMORY . . . 1935–1977," (2) any other posters, reproductions or copies containing any likeness of Elvis Presley, and (3) utilizing for commercial profit in any manner or form the name or likeness of Elvis Presley. The order also denied Pro Arts' motion to dismiss, stay or transfer. Pro Arts has duly perfected this interlocutory appeal from the order.[6]

Before addressing the merits, we must first dispose of Pro Arts' contention that the trial court abused its discretion in denying Pro Arts' motion to stay or transfer the present action to the Northern District of Ohio.[7] Pro Arts first argues that the case should have been transferred under 28 U.S.C. § 1404(a) (1976) for the convenience of parties and witnesses. According to Pro Arts, none of the parties are residents of New York, but instead each is incorporated and a resident of another state—Factors (Delaware), Boxcar (Tennessee), Pro Arts (Ohio), Stop and Shop (Massachusetts). Furthermore, Pro Arts contends that it is the chief defendant in the case and its principal place of business is located in Ohio, the state where all of its records, officers and witnesses are located. Defendant Stop and Shop, on the other hand, is merely a "straw man" joined to make possible a New York suit, and has nothing to do with the printing or manufacturing of the poster.

■ There can be no doubt that the burden is on the defendant, when it is the moving party, to establish that there should be a change of forum. *See Ford Motor Co. v. Ryan*, 182 F.2d 329, 330 (2d Cir.), *cert. denied*, 340 U.S. 851, 71 S.Ct. 79, 95 L.Ed. 624 (1950); *New York v. General Motors Corp.*, 357 F.Supp. 327, 328 (S.D.N.Y.1973); C. Wright, A. Miller and E. Cooper, 15

Federal Practice and Procedure 244 (1976) [hereinafter cited as Federal Practice and Procedure]. When a party seeks the transfer on account of the convenience of witnesses under § 1404(a), he must clearly specify the key witnesses to be called and must make a general statement of what their testimony will cover. 15 Federal Practice and Procedure 270. *See, e. g., Mendelson v. Fleischmann*, 386 F.Supp. 436, 439 (S.D.N.Y.1973). Not only was no such demonstration attempted, but Pro Arts did not even urge the convenience of witnesses and parties below as a ground for § 1404(a) transfer. Because the issue was not raised in the district court and supported by affidavits, there could be no abuse of discretion in not granting transfer on these grounds.

■ Pro Arts argues in the alternative that the case should have been transferred to Ohio under § 1404(a) or stayed pending resolution of the Ohio action, since essentially the same lawsuit involving the same parties and the same issues had been filed in Ohio before the New York case was filed. The rule in this circuit is that the first suit should have priority, " 'absent the showing of balance of convenience in favor of the second action' . . . or unless there are special circumstances which justify giving priority to the second." *William Gluckin & Co. v. International Playtex Corp.*, 407 F.2d 177, 178 (2d Cir. 1939), *quoting Remington Products Corp. v. American Aerovap, Inc.*, 192 F.2d 872 (2d Cir. 1951). The Supreme Court has articulated the test to be "wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation . . ." *Kerotest Manufacturing Co. v. C–O–Two Fire Equipment Co.*, 342 U.S. 180, 183, 72 S.Ct. 219, 221, 96 L.Ed. 200 (1952). In deciding between competing jurisdictions, the balancing of convenience should be left to the sound discretion of the district court.

---

**6.** 28 U.S.C. § 1292(a)(1). *See, e. g., Morning Telegraph v. Powers*, 450 F.2d 97 (2nd Cir. 1971), *cert. denied*, 405 U.S. 954, 92 S.Ct. 1170, 31 L.Ed.2d 231 (1972).

**7.** On appeal, Pro Arts has apparently abandoned its earlier contention that the New York

court lacked personal jurisdiction or venue over the parties, arguing only that the action should have been transferred or stayed on grounds of convenience and other equitable considerations.

*Id.* at 183–84, 72 S.Ct. 219; *William Gluckin & Co. v. International Playtex Corp.*, 407 F.2d at 178.

■ We conclude that the district court did not abuse its discretion by allowing the later filed action to proceed. First, at the time that this case was filed, two additional lawsuits against other defendants by Factors presenting the identical issue for resolution were pending in the Southern District of New York.[8] Efficient and responsible judicial administration dictated that these three cases be tried before the same forum. *Id. See Remington Products Corp. v. American Aerovap, Inc.*, 192 F.2d 872, 873 (2d Cir. 1951).

Second, Pro Arts' suit for declaratory judgment was filed in apparent anticipation of Factors' New York suit. When the declaratory judgment action has been triggered by a notice letter, this equitable consideration may be a factor in the decision to allow the later filed action to proceed to judgment in the plaintiffs' chosen forum. *Amerada Petroleum Corp. v. Marshall*, 381 F.2d 661, 663 (5th Cir. 1967). *Accord, Columbia Pictures Industries, Inc. v. Schneider*, 435 F.Supp. 742, 747 (S.D.N.Y.1977). As Mr. Justice Brennan has observed, "[t]he federal declaratory judgment is not a prize to the winner of a race to the courthouses." *Perez v. Ledesma*, 401 U.S. 82, 119 n. 12, 91 S.Ct. 674, 694, 27 L.Ed.2d 701 (1971) (Brennan, J. dissenting). In short, we find no abuse of discretion by the district court in its decision not to grant Pro Arts' motion to transfer the case to Ohio under § 1404(a) or stay the proceedings pending resolution of the Ohio action.

We now proceed to the determination of the principal issue in this case—whether or not the preliminary injunction was improvidently granted. In order to be granted a preliminary injunction under Rule 65(a), Fed.R.Civ.P., the movant must make " 'a clear showing of either (1) probable success on the merits *and* possible irreparable injury, *or* (2) sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a balance of hardships tipping decidedly toward the party requesting the preliminary relief.' " *Triebwasser & Katz v. American Tel. & Tel. Co.*, 535 F.2d 1356, 1358 (2d Cir. 1976) (emphasis in original), *quoting Sonesta International Hotels Corp. v. Wellington Assoc.*, 483 F.2d 247, 250 (2d Cir. 1973). The trial court employed the first prong of the test, finding that Factors had demonstrated probable success on the merits and possible irreparable injury. Because Pro Arts does not challenge the trial court's finding of possible irreparable harm, we need only address the first of the two requirements, that of probable success on the merits.

In concluding that Factors would likely prevail on the merits at trial, the court found that Elvis Presley exercised his right of publicity during his lifetime by giving Parker the exclusive authority to exploit his image through Boxcar Enterprises. This exclusive authority survived Presley's death, after which it was validly assigned to Factors. For this reason Pro Arts was enjoined from manufacturing, distributing, selling or otherwise profiting from merchandise bearing the name or likeness of the late Elvis Presley.

It is beyond cavil that the grant or denial of preliminary injunctive relief " 'will not be disturbed [on appeal] unless there is an abuse of [the trial court's] discretion . . . or unless there is a clear mistake of law.' " *New York v. Nuclear Regulatory Commission*, 550 F.2d 745, 751 (2d Cir. 1977), *quoting Triebwasser & Katz v. American Tel. & Tel. Co.*, 535 F.2d at 1358. On appeal, Pro Arts alleges two errors of law on the part of the trial court. According to Pro Arts, the trial court erred first in concluding that the right of publicity could survive the death of the celebrity. Second, Pro Arts argues that even if the right did so survive, Pro Arts was privileged, as a matter of law, in printing and distributing its "memorial poster" of Presley, because the poster celebrated a newsworthy event.

---

**8.** These two cases are *Factors Etc., Inc. v. Creative Card Co.*, 444 F.Supp. 279 (S.D.N.Y.1977), and *Factors Etc., Inc. v. The Wild Side, Inc.*, 77 Civ. 4705 (S.D.N.Y. Oct. 14, 1977).

The first issue, the duration of the so-called "right of publicity," is one of state law, more specifically the law of the State of New York. Because of the dearth of New York case law in this area, however, we have sought assistance from federal court decisions interpreting and applying New York law, as well as decisions from courts of other states.

As the district court noted, much confusion shrouds the so-called "right of publicity," largely because it has often been discussed under the rubric "right of privacy." As Dean Prosser has stated, the right of privacy embraces "four distinct kinds of invasion of four different interests of the plaintiff, which are tied together by the common name, but otherwise have almost nothing in common except that each represents an interference with the right of the plaintiff 'to be let alone.'" W. Prosser, Torts 804 (4th ed. 1971). Prosser has classified the four species of this tort as (1) intrusion upon the plaintiff's physical solitude or seclusion, *id.* at 807, (2) public disclosure of private facts, *id.* at 809, (3) false light in the public eye, *id.* at 812, and (4) appropriation of plaintiff's name or likeness for defendant's benefit, *id.* at 804.

The fourth type, appropriation of plaintiff's name or likeness for defendant's benefit, has in recent years acquired the label, "right of publicity." The distinguishing feature of this branch of the tort is that it involves the use of plaintiff's protected right for defendant's direct commercial advantage. The nature of the remedy also separates the right of publicity from the other three species of the tort. To protect his interest with respect to the first three, the injured party attempts to minimize the intrusion or publication of the damaging matter. In contrast, the right of publicity plaintiff does not necessarily object to the commercial exploitation—so long as the exploitation is at his behest and he is receiving the profits. This point was recently underscored by the Supreme Court in *Zacchini v. Scripps-Howard Broadcasting Co.,* 433 U.S. 562, 97 S.Ct. 2849, 53 L.Ed.2d 965

(1977). According to the Court, the interest protected:

> is closely analogous to the goals of patent and copyright law, focusing on the right of the individual to reap the reward of his endeavors and having little to do with protecting feeling or reputation.

*Id.* at 573, 97 S.Ct. at 2856.

> [The rationale is thus] "one of preventing unjust enrichment by the theft of good will. No social purpose is served by having the defendant get free some aspect of the plaintiff that would have market value and for which he would normally pay."

*Id.* at 576, 97 S.Ct. at 2857, quoting *Kalven, Privacy in Tort Law—Were Warren and Brandeis Wrong?* 31 Law & Contemp.Prob. 326, 331 (1966).

The State of New York provides a statutory right for the protection of a *living* person from commercial exploitation of his name and picture by others without his written consent.[9] This statutory right, also called a "right of privacy," is predicated upon the classic right of privacy's theoretical basis which is to prevent injury to feelings. *Price v. Hal Roach Studios, Inc.,* 400 F.Supp. 836, 843 (S.D.N.Y.1975); *Lombardo v. Doyle, Dane & Bernbach,* 58 A.D.2d 620, 396 N.Y.S.2d 661 (1977). In *Haelan Laboratories, Inc. v. Topps Chewing Gum, Inc.,* 202 F.2d 866 (2d Cir.), *cert. denied,* 346 U.S. 816, 74 S.Ct. 26, 98 L.Ed. 343 (1953), we recognized that the right of publicity exists independent from the statutory right of privacy and that it can be validly transferred by its owner:

> We think that, in addition to and independent of that right of privacy (which in New York derives from statute), a man has a right in the publicity value of his photograph, i. e., the right to grant the exclusive privilege of publishing his picture, and that such a grant may validly be made "in gross," i. e., without an accompanying transfer of a business or of anything else. Whether it be labelled a "property" right is immaterial; for here, as often elsewhere, the tag "property"

---

9. N.Y. [Civil Rights] Law §§ 50–51 (McKinney).

simply symbolizes the fact that courts enforce a claim which has pecuniary worth.

*Id.* at 868.

Since the landmark *Haelan Laboratories, Inc.* case, several decisions by courts applying New York law have labeled the right of publicity as a valid transferable property right, *see, e. g., Price v. Hal Roach Studios, Inc.,* 400 F.Supp. at 844; *Groucho Marx Productions, Inc. v. Playboy Enterprises, Inc.,* No. 77–1782 (S.D.N.Y. Dec. 30, 1977); *Lombardo v. Doyle, Dane & Bernbach,* 58 A.D.2d 620, 396 N.Y.S.2d 661 (1977), as well as recent decisions by courts applying the law of other states, *see, e. g., Cepeda v. Swift & Co.,* 415 F.2d 1205, 1206 (8th Cir. 1969); *Memphis Development Foundation v. Factors, Etc., Inc.,* 441 F.Supp. 1323, 1329 (W.D.Tenn.1977).

There can be no doubt that Elvis Presley assigned to Boxcar a valid property right, the exclusive authority to print, publish and distribute his name and likeness. In so doing, he carved out a separate intangible property right for himself, the right to a certain percentage of the royalties which would be realized by Boxcar upon exploitation of Presley's likeness and name. The identification of this exclusive right belonging to Boxcar as a transferable property right compels the conclusion that the right survives Presley's death. The death of Presley, who was merely the beneficiary of an income interest in Boxcar's exclusive right, should not in itself extinguish Boxcar's property right. Instead, the income interest, continually produced from Boxcar's exclusive right of commercial exploitation, should inure to Presley's estate at death like any other intangible property right. To hold that the right did not survive Presley's death, would be to grant competitors of Factors, such as Pro Arts, a windfall in the form of profits from the use of Presley's name and likeness. At the same time, the exclusive right purchased by

Factors and the financial benefits accruing to the celebrity's heirs would be rendered virtually worthless.

■ Though no New York court has directly addressed this issue,[10] the only two cases on point agree with our conclusion that the right of publicity should survive the celebrity's death. *See Memphis Development Foundation v. Factors, Etc., Inc.,* 441 F.Supp. 1323 (W.D.Tenn.1977); *Price v. Hal Roach Studios, Inc.,* 400 F.Supp. 836 (S.D.N.Y.1975). Of these two cases the *Price* case is particularly persuasive since it is a decision of a United States District Court purportedly applying New York law. *Price* involved a dispute over the ownership of the commercial right to use the names and likenesses of Stanley Laurel and Oliver Hardy ("Laurel and Hardy") following the death of the renowned comedians. The exclusive right to exploit the comedy team commercially was assigned to co-plaintiff Larry Harmon Pictures Corporation by Stan Laurel during his lifetime, by Oliver Hardy's widow and sole heir under Hardy's will, Lucille Hardy Price, and by Laurel and Hardy's production company, Laurel and Hardy Feature Productions. Several years later, when the *Price* defendants sought to utilize the name and likenesses of Laurel and Hardy, the owners sued. The district court held that the deaths of the actors did not extinguish the right of publicity held by the grantee of the right. This conclusion was found to be inherent in the distinction between the right of publicity and the right of privacy:

> Since the theoretical basis for the classic right of privacy, and of the statutory right in New York, is to prevent injury to feelings, death is a logical conclusion to any such claim. In addition, based upon the same theoretical foundation, such a right of privacy is not assignable during life. When determining the scope of the right of publicity, however, one must

---

10. We do note, however, dicta from a recent appellate division opinion, *Lombardo v. Doyle, Dane & Bernbach,* 58 A.D.2d 620, 396 N.Y.S.2d 661 (2d Dept. 1977), to the effect that "while a cause of action under the Civil Rights Law is

not assignable during one's lifetime and terminates at death, the right to publicity, e. g., the property right to one's name, photograph and image is under no such inhibition."

take into account the purely commercial nature of the protected right. Courts and commentators have done just that in recognizing the right of publicity as assignable. There appears to be no logical reason to terminate this right upon death of the person protected.

400 F.Supp. at 844. In sum, we hold that Boxcar's exclusive right to exploit the Presley name and likeness, because exercised during Presley's life, survived his death.[11] The right was therefore validly transferred to Factors following Presley's death.

 Pro Arts' final argument is that even if Factors possesses the exclusive right to distribute Presley memorabilia, this right does not prevent Pro Arts from publishing what it terms a "memorial poster" commemorating a newsworthy event. In support of this argument, Pro Arts cites *Paulsen v. Personality Posters, Inc.*, 59 Misc.2d 444, 299 N.Y.S.2d 501 (Sup.Ct.1968), a case arising out of the bogus presidential candidacy of the television comedian Pat Paulsen. Paulsen sued defendant for publishing and distributing a poster of Paulsen with the legend "FOR PRESIDENT." The court refused to enjoin sale of the poster because Paulsen's choice of the political arena for satire made him "newsworthy" in the First Amendment sense. We cannot accept Pro Arts contention that the legend "IN MEMORY  .  .  ." placed its poster in the same category as one picturing a presidential candidate, albeit a mock candidate. We hold, therefore, that Pro Arts' poster of Presley was not privileged as celebrating a newsworthy event.

In conclusion we hold that the district court did not abuse its discretion in granting the injunction since Factors has demonstrated a strong likelihood of success on the merits at trial. Factors possesses the exclusive right to print and distribute Elvis Presley memorabilia, a right which was validly transferred to it from Boxcar following Presley's death. Pro Arts infringed this right by printing and distributing the Elvis Presley poster, a poster whose publication was not privileged as a newsworthy event.

We affirm the action of the district court and remand for further proceedings.

---

11. Because the right was exploited during Presley's life, we need not, and therefore do not, decide whether the right would survive the death of the celebrity if not exploited during the celebrity's life.