BI–RITE ENTERPRISES, INC.; Pat Benatar; Neil Young; Rob Halford, K.K. Downing, Ian Hill, Glen Tipton and Dave Holland, Individually and as Members of the Musical Group Judas Priest; Bruce Crump, Banner Thomas, Duane Foland, Dave Hlubeck, Steve Holland and Jimmy Farrer, Individually and as Members of the Musical Group Molly Hatchet; Robert Casale, Gerald V. Casale, Merk Baugh, Robert Baugh and Alan Myers, Individually and as Members of the Musical Group Devo; Tommy Shaw, John Panozzo, James Young, Dennis De Young and Chuck Panozzo, Individually and as Members of the Musical Group Styx; Paul Di'anno, Steve Harris, Clive Burr, Dave Murray and Adrian Smith, Individually and as Members of the Musical Group, Iron Maiden; and all Other Persons Similarly Situated, Plaintiffs,

v.

BUTTON MASTER; Button-Up; Kraft Werk Co.; S.S.H. Enterprises, Ltd.; Little Island Marketing Ltd.; Harold Kaplan; Doug Blunden; Frank Mack; Luney Tunes Records and Tapes, Inc.; Phil Ceccola; Luney Tunes, Inc. and Barry Clark, Defendants.

No. 81–Civ.–5642(ADS).

United States District Court, S.D. New York.

Jan. 14, 1983.

Jules D. Zalon by Jules D. Zalon and David O'Driscoll, New York City, for plaintiffs.

Basile, Weintraub & Hanlon by Arnold Weintraub and Thomas E. Anderson, Troy, Mich., for defendants Button-Up Co. and Doug Blunden.

Leslie C. Schefman by Morris S. Friedman, Detroit, Mich., for defendants Kraft Werk and Harold Kaplan.

## OPINION AND ORDER

SOFAER, District Judge:

The plaintiffs in this case raise an array of claims aimed at protecting the commercial value of well-known trademarks on buttons. In recent years a major market has developed for the sale of novelty items bearing the likenesses, logos, trademarks, service marks and names (hereinafter the "marks") of popular recording artists. *See generally* McCarthy, *Important Trends in Trademark & Unfair Competition Law During the Decade of the 70's,* 71 Trademark Rptr. 93, 135 (1981). These novelty items are sold outside concert halls, on the streets, and in shops. Some who sell these items are licensed to do so by the persons or groups whose marks the items bear. Many sellers are not licensed, however, and the recent increased commercial significance of this novelty market has led owners and licensees of well-known marks to seek to control their exploitation.

Plaintiff Bi-Rite Enterprises ("Bi-Rite") is a manufacturer and distributor of posters, buttons, patches, bumper stickers and other novelty items bearing the marks of popular rock music groups. It sues both as the authorized licensee of various rock artists, some of whom are also joined as plaintiffs, and as a direct competitor seeking to prevent defendants from engaging in illegal and unfair competition. The plaintiffs also include several rock groups—Judas Priest, Molly Hatchett, Devo, Styx, and Iron Maiden—their individual members, and two solo performers, Neil Young and Pat Benatar (hereinafter collectively "the Performers"). These Performers have sued as trademark owners. Defendants are all manufacturers and/or distributors of buttons and other novelty items bearing among other things the marks of the plaintiff Performers and other rock groups.

Plaintiffs claim that defendants' unlicensed sales of buttons bearing logos and likenesses the plaintiffs own or control constitute trademark infringement and unfair competition under the common law, the New York General Business Law § 368–d (McKinney 1968), and § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1976). The Performers and Bi-Rite all assert that defendants are using marks which only the performers and/or Bi-Rite are authorized to

use. In addition, however, Bi-Rite seeks to enjoin defendants from distributing any buttons bearing marks for which defendants have no license or authorization, even though Bi-Rite has no license to use or police the marks at issue. Bi-Rite argues that in the button industry retail success depends upon the number of different, desirable buttons offered to the consumer. Unethical distributors who offer the most inclusive line of buttons therefore gain a competitive advantage in the market over dealers such as Bi-Rite, which are penalized and damaged by their own ethical practice of distributing buttons only of those groups for which they have licenses. Plaintiffs also claim defendants have violated their statutory right to privacy under New York Civil Rights Law § 51 (McKinney Supp. 1981), and their common law right of publicity. They argue that the undisputed facts establish all their common-law and statutory rights and therefore move for summary judgment on all claims.

Defendants admit that they are selling buttons bearing marks for which they have no license. They claim to be willing to stop selling buttons with marks that any legally empowered plaintiff instructs them not to use. Any other mark, they contend, is within their *de facto* power to use, because under industry custom a mark can be used on buttons until its owner proscribes its use. They claim that many rock groups and performers in fact welcome the unauthorized use of their marks on buttons as a source of free publicity, and consider the profits to be gained from licensing the use of their marks on buttons insignificant compared to the profits made on tee-shirts and other, more substantial items. They oppose summary judgment on plaintiffs' claims because they contend that Bi-Rite has failed to establish that it has the right to enforce any of the marks it claims, that Bi-Rite has no legal basis for enforcing marks which it is not licensed to enforce, and that Bi-Rite's attorney in this case has not proved that he is authorized to represent the other named plaintiffs.

## I. *Authority to Sue*

■ Defendants' effort to raise issues of fact concerning Bi-Rite's attorney's authority to represent the other named plaintiffs is insufficient. The attorney has filed notices of appearance for all the plaintiffs involved, and has made the plaintiffs' alleged agents available for depositions. Some of these agents have testified as to their authority to ask the attorney to represent the plaintiffs in this suit. Defendants have also been given every opportunity to write to, or to subpoena, the named plaintiffs to determine whether their names have properly been included in this law suit. Defendants have done nothing, however, to attempt to prove their claims. Such conduct cannot be permitted to create issues of fact, where the opposing side has offered substantial evidence to support its position. *Adickes v. S.H. Kress Co.,* 398 U.S. 144, 160–61, 90 S.Ct. 1598, 1609–10, 26 L.Ed.2d 142 (1970); *Applegate v. Top Associates, Inc.,* 425 F.2d 92, 96 (2d Cir.1970).

## II. *Unfair Competition*

■ Plaintiffs claim violations of their federal and state-law rights relating to unfair competition, trademark infringement, dilution, privacy, and publicity. All of plaintiffs' trademark and unfair competition claims, other than their state dilution claim, are resolved by the application of a single set of principles. " '[T]he law of trademark infringement is but a part of the law of unfair competition' and the same test is applied in determining each claim." *American Footwear Corp. v. General Footwear Co.,* 609 F.2d 655, 664 (2d Cir.1979), *cert. denied,* 445 U.S. 951, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980) (quoting from *Hanover Star Milling Co. v. Metcalf,* 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713 (1916)); *see also New West Corp. v. NYM Co. of California, Inc.,* 595 F.2d 1194, 1201 (9th Cir.1979) ("Whether we call the violation infringement, unfair competition or false designation of origin, the test is identical"); *Damn I'm Good, Inc. v. Sakowitz, Inc.,* 514 F.Supp. 1357, 1360 (S.D.N.Y.1981). In addition, the essential elements of state unfair competi-

tion and trademark infringement claims are but a restatement of unfair competition under the Lanham Act (the "Act"), 15 U.S.C. §§ 1063 et seq. (1976). *See International Society for Krishna Consciousness, Inc. v. Stadium Authority,* 479 F.Supp. 792, 798 (W.D.Pa.1979); *National Lampoon, Inc. v. American Broadcasting Co.,* 376 F.Supp. 733, 747 (S.D.N.Y.1974); *Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.,* 42 N.Y.2d 538, 542, 369 N.E.2d 1162, 1164, 399 N.Y.S.2d 628, 630 (1977). Therefore, an analysis of plaintiffs' § 43(a) claim will subsume all other related claims.

Congress enacted the Act "to regulate commerce within [its] control by making actionable the deceptive and misleading use of marks in such commerce" and "to protect persons engaged in such commerce against unfair competition...." 15 U.S.C. § 1127 (1976); *see Colligan v. Activities Club of New York, Ltd.,* 442 F.2d 686 (2d Cir.1971). Section 43(a) of the Act provides:

> Any person who shall affix, apply or annex, or use in connection with any goods or services, ... a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce ... shall be liable to a civil action by ... any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

Section 43(a), and unfair competition law in general, function primarily to protect consumers from confusion as to the source of goods in the market. *See, e.g., Warner Bros., Inc. v. Gay Toys, Inc.,* 658 F.2d 76, 79 (2d Cir.1981); *International Order of Job's Daughters v. Lindeburg & Co.,* 633 F.2d 912, 917 (9th Cir.1980); *American Footwear Corp. v. General Footwear Co.,* 609 F.2d 655, 662 (2d Cir.1979); *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 604 F.2d 200, 204 (2d Cir.1979); *Silverstar Enterprises, Inc. v. Aday,* 537 F.Supp. 236, 241 (S.D.N.Y.1982); *Warner Bros., Inc. v. American Broadcasting Co.,* 530 F.Supp. 1187, 1197 (S.D.N.Y.1982)

(" 'the touchstone of both trademark infringement and unfair competition is the likelihood of confusion among prospective purchasers' ") (quoting *Menley & James Laboratories, Ltd. v. Approved Pharmaceutical Corp.,* 438 F.Supp. 1061, 1066 (N.D.N.Y.1977). The general policy underlying trademark protection is to allow producers of goods and services exclusive rights in a mark that reflects the good-will and quality reputation they have established, thereby enabling the public to identify their goods and services without confusion in the market. By imposing sanctions on parties that pass off their goods and services as those of other established producers, consumers gain confidence in the source and quality of the goods they purchase, and producers reap benefits from investments they make in establishing their unique identity among the purchasing public. *See Dallas Cowboy Cheerleaders, Inc.,* 604 F.2d at 205.

Plaintiffs seek to expand § 43(a) protection beyond these bounds. They rely on the broad remedial language of § 43(a), which provides a remedy to "any person who believes that he is or is likely to be damaged ...," and on several cases that give this language an expansive meaning, to support their position that the Act proscribes the unauthorized use of marks as decorative emblems on collateral merchandise, such as T-shirts, buttons, and bumper stickers. Thus, plaintiffs cite *CBS Inc. v. Springboard International Records,* 429 F.Supp. 563, 566 (S.D.N.Y.1976), for the proposition that, "In enacting the section, Congress in effect created a new federal statutory tort. The section is clearly remedial and should be broadly construed." And they rely heavily on *Boston Professional Hockey Assn, Inc. v. Dallas Cap & Emblem Mfg., Inc.,* 510 F.2d 1004 (5th Cir.) *cert. denied,* 423 U.S. 868, 96 S.Ct. 132, 46 L.Ed.2d 98 (1975), in which the Fifth Circuit, in what it called a case of "first impression," 510 F.2d at 1008, enjoined as a trademark violation under both §§ 114 and 1125(a) of the Act the unauthorized manufacture and sale of embroidered cloth emblems bearing the trademarks of numerous professional hockey teams.

In *Boston Hockey,* the defendant sold its emblems to sporting goods stores, which in turn attached them to other items for sale. The Court recognized the "difficulty" of extending trademark protection to this "reproduction of the trademark itself." Nevertheless, the Court reversed the District Court's conclusion that such an extension "would be tantamount to the creation of a copyright monopoly for designs that were not copyrighted," and granted relief. It held that consumers need not be confused as to the source of the goods—the emblems—but need only be aware of the "self-evident" source of the trademark symbols to establish a statutory violation. The Court reasoned:

> The confusion or deceit requirement is met by the fact that the defendant duplicated the protected trademarks and sold them to the public knowing that the public would identify them as being the teams' trademarks. The certain knowledge of the buyer that the source and origin of the trademark symbols were in the plaintiffs satisfies the requirement of the act. The argument that confusion must be as to the source of the manufacture of the emblem itself is unpersuasive, where the trademark, originated by the team, is the triggering mechanism for the sale of the emblem.

*Id.* at 1012.

Subsequent decisions have similarly granted relief against distributors which, without authorization, placed the marks of rock groups on T-shirts and sold them at concerts where the groups were playing. *See Winterland Concessions Co. v. Sileo,* 528 F.Supp. 1201, 1214 (N.D.Ill.1981); *Joel v. Various John Does,* 499 F.Supp. 791, 792 (E.D.Wisc.1980); *cf. In re Paramount Pictures,* 213 U.S.P.Q. 1111, 1112–14 (TTAB 1982) (Board recognizes right to protection of mark against use on collateral goods). These decisions dispense even with the pretense of an analytic effort to extend trademark relief. *Joel,* for example, merely states: "having reviewed the pertinent authority, I am convinced that the defendants' conduct is proscribed by § 43(a) and by the law of Wisconsin." 499 F.Supp. at 792.

■ This push to extend trademark protection to the use of established marks on collateral products is only the most recent manifestation of the effort (as old as the trademark law itself) to protect the full economic value of distinctive marks. *See generally* 3 R. Callman, *Unfair Competition, Trademarks and Monopolies* (3d ed. 1969). The cause is rooted in fairness and commercial good sense. People establish marks through effort and investment, and the value embodied in these marks should be protected against those who would steal or dilute it. The zeal to protect the full value of marks, and the feelings and economic interests that fuel it, however, cannot negate the fact that unfair competition law clearly requires confusion as to the source of goods before it will protect against the unauthorized use of a mark.

■ Copyright and patent laws grant to the creators of original expression and ideas monopoly power over their use and sale. Congress sanctioned such monopoly power to reward and encourage originality and creativity in otherwise competitive markets. *See, e.g., Hoehling v. Universal City Studios, Inc.,* 618 F.2d 972, 974 (2d Cir.1980). Trademark laws do not share this purpose. They function instead to protect the individual reputation and good-will that parties build for their goods in the market. *International Order of Job's Daughters v. Lindeburg & Co.,* 633 F.2d 912, 918–19 (9th Cir.1980). "[T]rademark rights, unlike statutory copyrights or patents, are not rights in gross or at large." *American Footwear Corp. v. General Footwear Co.,* 609 F.2d 655, 663 (2d Cir.1979), *cert. denied,* 445 U.S. 951, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980). This distinction made by Congress in its legislative scheme is not merely one of form, having no basis in policy or fairness. Although industry and investment are encouraged by protecting distinctive marks, they are also encouraged by a system that allows entrepreneurs to copy and exploit such marks in nonconfusing ways. Indeed, a system that permits nonconfusing copying may achieve greater

social utility and wealth than a system that protects marks without a showing of confusion. The originator of a mark may in some circumstances lose far less in economic value because of copying by others than is gained by the copiers and the public. Copying enables one to sell the mark for a lower price than the originator is able or inclined to sell, thereby making the goods involved accessible to more consumers as the price is reduced. Indeed, the freedom to copy tends to create competition among copiers, and will drive down prices to the point where the marginal return on investment is merely adequate, thus creating the broadest practicable public access to goods, and tending to prevent monopoly profits and prices.

These policies explain Congress' limitations on trademark protection. They apply with particular force in connection with the use of marks on buttons, for buttons tend primarily to be a medium for communicating ideas or positions; they are not commodities sold to serve any other functional purpose. Under these circumstances expression is enhanced when manufacturers are free to copy and distribute widely the message.

The controlling principles in the Second Circuit are stated in *American Footwear Corp. v. Universal Footwear Co.,* 609 F.2d 655 (2d Cir.1979), *cert. denied,* 445 U.S. 951, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980). In that case, the creators of the television series "The Six-Million Dollar Man" sued to prevent a footwear manufacturer from using the word "Bionic" on its boots. The Court specifically found that the television program had led to the creation of a distinctive mark, and that the shoe manufacturer, to gain sales, had used the word "Bionic" for its association with the television character and program. The Court held, however, that the absence of any showing that consumers were confused or that defendant attempted to inspire confusion as to the sponsorship or source of the boots defeated plaintiff's Lanham Act claim. Noting that the right "to exclusive use of a trademark derives from, and is limited by, its actual use in the marketplace," *id.* at 663–64, the Court ruled that "one can capitalize on a

market or fad created by another provided that it is not accomplished by confusing the public into mistakenly purchasing the product in the belief that the product is the product of the competitor," *id.* at 662. Several courts have followed and embellished this analysis. *See, e.g., International Order of Job's Daughters v. Lindeburg & Co.,* 633 F.2d 912, 919 (9th Cir.1980); *Damn I'm Good, Inc. v. Sakowitz, Inc.,* 514 F.Supp. 1357, 1362 (S.D.N.Y.1981).

Judge Knapp recently stated in considering the meaning given by the Fifth Circuit in *Boston Hockey* to "confusion": "We do not believe our Circuit would agree that such an extension of heretofore accepted concepts should ... be accomplished by judicial, rather than legislative fiat." *Warner Bros. Inc., v. Gay Toys, Inc.,* 513 F.Supp. 1066, 1070 (S.D.N.Y.), *rev'd on other grounds,* 658 F.2d 76 (2d Cir.1981). In this Circuit, marks that are exploited only for their functional value and not to confuse the public receive no protection under unfair competition laws. Functionality in this context means that consumers desire the mark for its intrinsic value and not as a designation of origin. *Ives Laboratories v. Derby Drug Co.,* 601 F.2d 631, 643 (2d Cir. 1979); *accord Job's Daughters,* 633 F.2d at 918. When a mark without copyright protection is exploited for its intrinsic functional value, Congress has implicitly determined that society's interest in free competition overrides the owner's interest in reaping monopoly rewards. *See Ives Laboratories,* 601 F.2d at 643; *Damn I'm Good, Inc.,* 514 F.Supp. at 1360.

These principles do not as a matter of law preclude protection against the use of marks on emblems, buttons, or other novelty items. They require the owner to establish that the particular use of a functional mark on the product involved will cause or was intended to cause consumer confusion as to source. In certain contexts, such as at concerts where the mark's owner performs, the public may, in fact, assume that the owner of the mark sponsored or even produced the goods—emblems, buttons

or T-shirts—that bear its mark. An evidentiary record that established such confusion, or created a presumption that the manufacturer sought to confuse consumers as to source, would supply a basis for protection. But plaintiffs have not even attempted to prove confusion in the sense required by the Act. Defendants will be entitled to summary judgment if this failure remains unrectified.

Plaintiffs, meanwhile, are certainly not entitled to summary relief. The Lanham Act imposes no restraint on the free marketing of functional marks which consumers or manufacturers mount on collateral items as a means of personal expression. As the Ninth Circuit noted in *Job's Daughters:*

> We commonly identify ourselves by displaying emblems expressing allegiances. Our jewelry, clothing, and cars are emblazoned with inscriptions showing the organizations we belong to, the schools we attend, the landmarks we have visited, the sports teams we support, the beverages we imbibe. Although these inscriptions frequently include ... trademarks, it would be naive to conclude that the name or emblem is desired because consumers believe that the product somehow originated with or was sponsored by the organization the name or emblem signifies.

633 F.2d at 918.

### III. *Dilution*

Plaintiffs fail to support their dilution claim brought under New York General Business Law § 368–d (McKinney 1968). The applicability of New York law to plaintiffs' dilution claim is questionable; neither plaintiffs nor defendants have significant contacts with the state. Nevertheless, because dilution statutes vary little as to their content and underlying policies, a conflict-of-laws analysis is unnecessary; it suffices to demonstrate the unavailability of a dilution cause of action under New York law.

Dilution refers to a whittling away of an established trademark's distinctiveness, and hence its selling power, through its unauthorized placement on dissimilar products. *Stop the Olympic Prison v. United States Olympic Committee,* 489 F.Supp. 1112, 1123 (S.D.N.Y.1980); *Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.,* 42 N.Y.2d 538, 542, 369 N.E.2d 1162, 1164, 399 N.Y.S.2d 628, 630 (1977). When consumers are confronted with dissimilar use of a strong trademark they tend no longer to associate the mark with the quality reputation that a producer may have established in the market. Section 368–d provides injunctive relief to holders of marks that suffer such dilution.

Section 368–d, however, does not reach defendants' use of plaintiffs' marks. Although, by its own terms, the statute does not require public confusion, it does require a likelihood of injury to plaintiffs' business reputations or dilution of the distinctive quality of their marks. *See Allied Maintenance Corp.,* 42 N.Y.2d at 544–45, 369 N.E.2d at 1166, 399 N.Y.S.2d at 632. Plaintiffs have not made this requisite showing of harm. To the contrary, it seems that defendants' use only operates to strengthen plaintiffs' marks. Rather than clouding the distinctive message of quality that plaintiffs' marks carry, defendants provide fans of the various Performers an opportunity to announce their allegiance to the groups, thereby publicizing the popularity of the groups. Thus, although defendants are clearly capitalizing on the popular appeal plaintiffs have built in their names or likenesses, plaintiffs have failed to allege, let alone demonstrate, that such use will weaken the appeal of their names and thereby provide a basis for relief under § 368–d.

### IV. *Rights of Privacy and Publicity*

Pendant jurisdiction exists over plaintiffs' claims of privacy, N.Y. Civil Rights Law § 51 (McKinney Supp.1981), and of publicity under New York law; they arise out of the same core of operative facts as do plaintiff's substantive federal claims, and taken together they "are such that [plaintiffs] would ordinarily be expected to try them all in one judicial proceeding."

*United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). "[P]endant jurisdiction is a doctrine of discretion, not of plaintiff's right," *id.* at 726, 86 S.Ct. at 1139, however, and it should be exercised only after giving due consideration to judicial economy, convenience and fairness to the litigants. In this case, the interests in reaching the state law issues overcome the interest in allowing the state courts to act. This Court has expended substantial time and effort familiarizing itself with the facts and law involved, and the right of publicity claim—the only viable claim asserted—presents the unusual situation of a state law doctrine developed almost exclusively in federal decisions. *See, e.g., Factors etc., Inc. v. Pro Arts, Inc.,* 579 F.2d 215, 220 (2d Cir.1978), *cert. denied,* 440 U.S. 908, 99 S.Ct. 1215, 59 L.Ed.2d 455 (1979). Therefore neither fairness nor efficiency will be served by requiring plaintiffs to proceed in one or perhaps more state courts on these claims.

■ Plaintiffs raise their privacy and publicity claims under New York law. None of the defendants contests this choice of law. But recent Second Circuit decisions compel this Court, *sua sponte,* to "apply the substantive law of the state to which the forum state, New York, would have turned had the suit been filed in state court." *Factors Etc., Inc. v. Pro Arts, Inc.,* 652 F.2d 278, 280 (2d Cir.1981). "[A] New York Court, considering a right of publicity case, would apply its property choice-of-law rules to select the state whose law determines whether a plaintiff has a protectible right of publicity." *Groucho Marx Productions v. Day & Night Co.,* 689 F.2d 317, 319 (2d Cir.1982). In considering the privacy claim, a New York court would apply its choice-of-law rules for torts. Property choice-of-law rules focus on the situs of the property, *Wyatt v. Fulrath,* 16 N.Y.2d 169, 211 N.E.2d 637, 264 N.Y.S.2d 233 (1965), while tort rules requires a "grouping of contacts" approach, *Babcock v. Jackson,* 12 N.Y.2d 473, 191 N.E.2d 279, 240 N.Y.S.2d 743 (1963); in both instances the law of the states in which plaintiffs or their exclusive licensees reside controls.

■ Plaintiffs Pat Benatar, Neil Young and members of the group Devo, plus their managers or licensees, all reside in California. Pl. Dec. 2, 1982, brief at 9. Accordingly the situs of these plaintiffs' proprietary publicity interest is California, which is also the forum with the most acute concern for plaintiffs' privacy. Similar reasoning dictates that Illinois law control the rights of the group Styx, though one of its members is a Michigan resident, and that Georgia law apply to the group Molly Hatchet. Bi-Rite, an Illinois corporation with its principal place of business in Illinois, is also subject to Illinois law. All members of the groups Judas Priest and Iron Maiden reside in Great Britain, but market themselves exclusively through a Georgia based merchandising representative; Georgia law controls their rights.

■ Plaintiffs have failed to state a privacy cause of action under any relevant source of law. The New York privacy statute on which they incorrectly rely allows "[a]ny person whose name, portrait or picture is used within this state for advertising purposes or for purposes of trade without written consent [to] ... maintain an equitable action ... [or to] sue and recover damages...." New York Civil Rights Law § 51 (McKinney Supp.1981). California has a similar privacy statute which reads, "Any person who knowingly uses another's name, photograph or likeness, in any manner, for purposes of advertising ... or for purposes of solicitation of purchases of products ... without ... prior consent ... shall be liable for any damages ...." Cal. Civ.Code § 3344 (West 1975). Neither Illinois nor Georgia has such a statutory provision, but both recognize a common law right of privacy which supplies the basis for four independent torts: 1) intrusion upon the plaintiff's seclusion; 2) public disclosure of embarrassing private facts, 3) publicity that places plaintiff in a false light; and 4) appropriation, for the defendant's advantage, of plaintiff's name or likeness. *See Martin Luther King Jr. Center for Social Change, Inc. v. American Heritage Prod-*

ucts, Inc., 694 F.2d 674, 679 (11th Cir.1983); *Kelly v. Franco,* 72 Ill.App.3d 642, 391 N.E.2d 54, 57 (Ill.App.1979). *See generally* W. Prosser, *Law of Torts* ch. 20 (4th ed. 1971).

New York's Section 51 protects a person's feelings and right to be let alone, *Brinkley v. Casablancas,* 80 A.D.2d 428, 438 N.Y.S.2d 1004, 1012 (1st Dep't 1981); *Lombardo v. Doyle, Done & Bernback, Inc.,* 58 A.D.2d 620, 396 N.Y.S.2d 661, 664 (2d Dep't 1977), interests also protected in California, Illinois, and Georgia. Relief is available under the applicable privacy law only for acts that invade plaintiffs' privacy and consequently bruise their feelings. Chief Justice Bird's analysis of the California statute in *Lugosi v. Universal Pictures,* 25 Cal.3d 813, 842 n. 23, 603 P.2d 425, 443 n. 23, 160 Cal.Rptr. 323, 341 n. 23 (1979) (Bird, C.J., dissenting), makes clear that its primary purpose, like that of common law privacy, is to protect the feelings and privacy of the "little man."

Plaintiffs' claims fail under this standard, for as public figures, with their likenesses, names and images already in the public domain, they have waived their rights to claim intrusions into their common law privacy rights. *See Uhlaender v. Hendricksen,* 316 F.Supp. 1277, 1280 (D.Minn. 1970); *Lugosi v. Universal Pictures,* 25 Cal.3d 813, 844, 603 P.2d 425, 444, 160 Cal. Rptr. 323, 342 (1979) (Bird, C.J., dissenting). Moreover, they cannot demonstrate harm to their feelings justifying legal action. *See Martin Luther King, Jr. Center for Social Change, Inc. v. American Heritage Products, Inc.,* 508 F.Supp. 854, 862 (N.D.Ga. 1981), *rev'd on other grounds,* 694 F.2d 674 (11th Cir.1983); *Lugosi,* 25 Cal.3d at 844, 603 P.2d at 444, 160 Cal.Rptr. at 342 (Bird, C.J., dissenting). Likewise, plaintiffs, as public figures, probably lose their rights to claim injury under the California statute. *See Lugosi,* 25 Cal.3d at 842 n. 23, 603 P.2d 423 n. 23, 160 Cal.Rptr. 341 n. 23 (Bird, C.J., dissenting). Bi-Rite's privacy claim must also be dismissed, since it cannot assert an interest in the nonassignable and personal privacy rights of its licensors. *See Ameri-*

*can Heritage Products,* 508 F.Supp. at 862; *Lugosi,* 25 Cal.2d at 819, 603 P.2d at 428; 160 Cal.Rptr. at 326.

Plaintiffs fare better under the so-called "right of publicity," a tort derived from the appropriation branch of the right to privacy. That right, recognized in all three states, *see Martin Luther King, Jr. Center for Social Change, Inc.,* 694 F.2d at 680 (11th Cir.1983); *Winterland Concessions Co. v. Sileo,* 528 F.Supp. 1201, 1213–14 (N.D. Ill.1981); *Lugosi,* 25 Cal.3d at 820, 603 P.2d 429, 160 Cal.Rptr. 327; *McQueen v. Wilson,* 117 Ga.App. 488, 491–92, 161 S.E.2d 63, 66, *rev'd on other grounds,* 224 Ga. 420, 162 S.E.2d 313 (1968); *National Football League Properties, Inc. v. Consumer Enterprises, Inc.,* 26 Ill.App.3d 814, 327 N.E.2d 242, 245 (1975), grants a person an exclusive right to control the commercial value of his name and likeness and to prevent others from exploiting that value without permission, *American Heritage Products, Inc.,* 694 F.2d at 680 (11th Cir.1983); *Lugosi,* 25 Cal.2d at 823–24, 603 P.2d at 431, 160 Cal. Rptr. at 329; *see Haelen Laboratories, Inc. v. Topps Chewing Gum, Inc.,* 202 F.2d 866, 868 (2d Cir.1953). *See generally* Winner, *Right of Identity: Right of Publicity and Protection for a Trademark's "Persona,"* 71 Trademark Rep. 193 (1981). It prevents unjust enrichment by providing a remedy against exploitation of the goodwill and reputation that a person develops in his name or likeness through the investment of time, effort, and money. *See Zacchini v. Scripps-Howard Broadcasting Co.,* 433 U.S. 562, 575–76, 97 S.Ct. 2849, 2857, 53 L.Ed.2d 965 (1977).

Judge Werker of this Court recently outlined a three-part test for right of publicity claims:

An individual claiming a violation of his right to publicity must show: (1) that his name or likeness has publicity value; (2) that he himself has "exploited" his name or likeness by acting "in such a way as to evidence his ... own recognition of the extrinsic commercial value of his ... name or likeness, and manifested that recognition in some overt manner"; and

(3) that defendant has appropriated this right of publicity, without consent, for advertising purposes or for the purposes of trade.

*Lerman v. Chuckleberry Publishing, Inc.,* 521 F.Supp. 228, 232 (S.D.N.Y.1981) (citations omitted) (quoting *Hicks v. Casablanca Records,* 464 F.Supp. 426, 429 (S.D.N.Y. 1978). The Second Circuit apparently defines the right of publicity more expansively than do Illinois and California courts. *Compare Factors Etc. Inc. v. Pro Arts Inc.,* 579 F.2d 215, 221–22 (2d Cir.1978), *cert. denied,* 440 U.S. 908, 99 S.Ct. 1215, 59 L.Ed.2d 455 (1979) *and Haelan Laboratories v. Topps Chewing Gum,* 202 F.2d 866, 868 (2d Cir.1953) *with Lugosi,* 25 Cal.3d at 823–24, 603 F.2d at 431–32, 160 Cal.Rptr. at 329–30. But the three-part test in *Lerman* is consistent with the manner in which these courts have construed the right. The Georgia courts apply a more relaxed standard than does the Second Circuit and would not require that the holder have exploited the right. *See American Heritage Products,* 694 F.2d at 683 (11th Cir.1983).

▬ The plaintiff Performers have satisfied this three-part test. The Performers' names have financial value; they are all celebrities who have won gold or platinum records. See Affidavit of S. Traiman ¶ 6. This celebrity status carries publicity value in the market that exists for exploiting names, faces and reputations of celebrities. *See Ali v. Playgirl, Inc., supra,* 447 F.Supp. 723, 729 (S.D.N.Y.1978); *Grant v. Esquire, Inc.,* 367 F.Supp. 876, 881 (S.D.N.Y.1973). Moreover, the Performers have actively cultivated the popularity of their names and music in an aggressively competitive recording market. Finally, defendants admit to their unauthorized appropriation of the publicity value of plaintiffs' names and symbols. *See* Affidavit of D. Blunden ¶¶ 3, 4.

▬ As individuals, plaintiffs Neil Young and Pat Benatar are entitled to summary judgment for violation of their right of publicity. The group Performers also qualify for summary judgment. While only one court has apparently recognized a group's right of publicity, *see Winterland Concessions Co. v. Sileo,* 528 F.Supp. 1201, 1213 (N.D.Ill.1982), the rationale for protecting that interest extends to groups that have "persona" sufficiently strong to meet the requirements applied to individuals. The theoretical underpinnings of the right of publicity are distinct from the more personal components of the right of privacy. *See Factors Etc. Inc. v. Pro Arts, Inc.,* 579 F.2d at 220; *Lugosi,* 25 Cal.3d at 833–43, 603 P.2d at 437–44, 160 Cal.Rptr. at 335–43. Privacy decisions limit actions to individuals, because the right of privacy is intended to protect individual personality and feelings. The right of publicity, on the other hand, seeks to protect the commercial value acquired by names and likenesses due to investments of time, energy, money, and talent. *Zacchini v. Scripps-Howard Broadcasting Co.,* 433 U.S. 562, 575, 97 S.Ct. 2849, 2857, 53 L.Ed.2d 965 (1977). It protects the persona—the public image that makes people want to identify with the object person, and thereby imbues his name or likeness with commercial value marketable to those that seek such identification. Winner, *Right of Identity: Right of Publicity and Protection of a Trademark's "Persona",* 71 Trademark Rep. 193, 193 (1981). A group that develops market value in its persona should be *as* entitled as an individual to publicity rights in its name. *Cf.* 3 R. Callmann, *Unfair Competition, Trademarks & Monopolies* § 83.3(a)(3), (b)(2)b (3d ed. 1969) (complaining of the inconsistency of limiting right to privacy protection to individuals). The rationale for protecting the right to publicity does not justify treating similarly situated plaintiffs differently merely because one is an individual and one is a group member.

▬ Plaintiff Bi-Rite, as the exclusive licensee of various rock groups, may also assert this claim. Unlike privacy rights, which protect personality and feelings and are therefore not assignable, the right of publicity gives rise to a "proprietary" interest in the commercial value of one's persona which is assignable and may be freely licensed. *See American Heritage Products,*

694 F.2d at 680–81 (11th Cir.1983); *Lugosi,* 25 Cal.3d at 327, 329, 339. This proprietary interest is much like a copyright, *see Zacchini,* 433 U.S. at 576, 97 S.Ct. at 2857; it embodies a bundle of exclusive marketing rights which its holder may transfer in its entirety by an assignment or in part by exclusive licenses. Holders of exclusive licenses gain standing to protect their interests against all who would encroach on the exclusive rights embodied in the licenses. *See* Note, *Transfer of the Right of Publicity: Dracula's Progeny and Privacy's Stepchild,* 22 U.C.L.A. 1103, 1117, 1120 & n. 80 (1975); *cf.* 17 U.S.C. § 501(b) (Supp. III 1979); *Dodd, Mead & Co., Inc. v. Lilienthal,* 495 F.Supp. 135, 137 (S.D.N.Y.1980); 3 M. Nimmer, *Nimmer on Copyright* ¶¶ 10.02, 12.02 (1982). The Second Circuit early recognized the transferability of this right and the standing it accords in a suit by an exclusive licensee:

> We think that, in addition to and independent of that right of privacy . . . , a man has a right in the publicity value of his photograph, *i.e.,* the right to grant the exclusive privilege of publishing his picture, and that such a grant may validly be made "in gross." . . .
>
> . . . [M]any prominent persons . . . , far from having their feelings bruised through public exposure of their likenesses, would feel sorely deprived if they no longer received money for authorizing advertisements. . . . This right of publicity would usually yield them no money unless it could be made the subject of an exclusive grant which barred any other advertisers from using their pictures.

*Haelen Laboratories, Inc. v. Topps Chewing Gum, Inc.,* 202 F.2d 866, 868 (2d Cir.) *cert. denied,* 346 U.S. 816, 74 S.Ct. 26, 98 L.Ed. 343 (1953); *see also Factors Etc., Inc. v. Creative Card Co.,* 444 F.Supp. 279 (S.D.N.Y.1977) (acknowledging potential damage to exclusive licensee of Elvis Presley from unauthorized merchandising) *aff'd sub. nom Factors Etc., Inc. v. Pro Arts, Inc.,* 579 F.2d 215 (2d Cir.1978), *cert. denied,* 440 U.S. 908, 99 S.Ct. 1215, 59 L.Ed.2d 455 (1979).

■ Defendants, in fact, do not contest the standing Bi-Rite would acquire as an exclusive licensee, but instead charge that the licenses do not confer exclusive rights on Bi-Rite, or expressly withhold from Bi-Rite the power to sue. A nonexclusive licensee acquires no proprietary interest in the publicity rights of the licensor and accordingly has no standing to sue for violation of those rights. *Cf.* M. Nimmer, *supra,* at ¶¶ 10.02, 12.02. Bi-Rite is in fact without standing to assert right of publicity claims under its non-exclusive licenses with Rush and Journey; *see* Pl. Reply Affirmation Ex. G, H; defendants are granted summary judgment on these claims. But Bi-Rite's licensing agreements with The Who, Pink Floyd, Molly Hatchet and Devo expressly grant it exclusive rights to merchandise the marks of these groups on specified articles, including buttons, *see id.* Ex. A, G; Pl. Reply Memorandum at 5; Bi-Rite is therefore entitled to summary judgment on these licenses. The limits imposed in the licenses on Bi-Rite's power to protect the marks pertain only to its power to bring actions to prevent infringements on its licensors' marks. They do not impede its right to sue to protect the publicity rights it acquires through the exclusive agreements. Finally, issues of fact exist as to whether Bi-Rite's licensing agreements with Foreigner, Judas Priest, and Triumph extend to buttons, *see* Pl. Reply Affirmation Ex. C, D, E. Bi-Rite has failed to indicate whether these licenses have been renewed to cover the period of time for which damages are claimed. These issues must be resolved before summary judgment could be granted, one way or the other.

■ The exclusive licenses held by Bi-Rite define and impose the limits on its publicity rights. Consequently, its effort to require defendants to obtain licenses for *all* the marks they merchandise, and not just for those marks that damage Bi-Rite's licenses, must fail. Only parties with interests in the proprietary right of publicity have standing to challenge encroachments on those rights. Sound reasons might lead a performer to ignore the mounting of his name on a button, including the increased notoriety (and value) that may accrue to his

name from such use. Defendants, and Bi-Rite also, may freely exploit the names of performers, though at the risk that a party holding the proprietary right may complain and seek relief.

The right of publicity therefore grants plaintiffs relief where none exists under federal law. Federal preemption poses no bar to such relief. "The intangible proprietary interest protected by the right of publicity simply does not constitute a writing," *Lugosi,* 25 Cal.3d at 849, 603 P.2d at 448, 160 Cal.Rptr. at 346 (Bird, C.J., dissenting); *see also Factors Etc., Inc. v. Pro Arts, Inc.,* 496 F.Supp. 1090, 1097 (1980), *rev'd on other grounds,* 652 F.2d 278 (2d Cir.1981); *Price v. Hal Roach Studios, Inc.,* 400 F.Supp. 836, 842–46 (S.D.N.Y. 1975), and therefore falls outside of the preemption standards established by Congress in the copyright law, 17 U.S.C. § 301 (Supp. III. 1979); *cf.* Notes of the Committee on the Judiciary, H.R.Rep. No. 1476, 94th Cong., 2d Sess. 132, *reprinted in* U.S. Code Cong. & Admin.News 5659, 5748 ("The evolving common law rights of 'privacy,' 'publicity,' and trade secrets . . . would remain unaffected [by the copyright law's preemption provision] as long as the causes of action contain elements . . . that are different in kind from copyright infringement."). Nor does the Lanham Act prevent states from creating rights against forms of unfair competition broader than those encompassed in the federal statute. "The Supremacy Clause bars only state statutes or doctrine that would permit the sort of confusing or deceptive practices the draftsmen of the Lanham Act sought to prevent." *Keebler Co. v. Rovira Biscuit Corp.,* 624 F.2d 366, 372 n. 3 (1st Cir.1980) (quoted in *Purolator, Inc., v. EFRA Distributors, Inc.,* 687 F.2d 554, 560 (1st Cir.1982); *see Golden Door, Inc. v. Odisho,* 646 F.2d 347, 352 (9th Cir.1980); *Mariniello v. Shell Oil Co.,* 511 F.2d 853, 858 (3d Cir.1975).

In summary, plaintiffs have failed to demonstrate confusion under the Lanham Act and accordingly are denied summary judgment. The Performers are all granted summary judgment for violations of their rights of publicity. They are entitled to injunctive relief, as well as damages, for these violations. *See Ali v. Playgirl, Inc.,* 447 F.Supp. 723, 729 (S.D.N.Y.1978). Defendants are ordered to cease immediately their unauthorized manufacture and distribution of plaintiff's marks. Bi-Rite is granted summary judgment for violations of publicity rights it holds under its exclusive licenses with The Who, Pink Floyd, Molly Hatchet and Devo. Defendants are ordered to cease their activities with respect to these groups. Factual issues as to the exclusivity and currency of Bi-Rite's licenses with Foreigner, Judas Priest and Triumph preclude summary judgment on their publicity rights. Bi-Rite must supply the Court with information necessary to decide these issues within 30 days of this order, or defendants will be granted summary judgment as to these licenses. All plaintiffs must submit affidavits detailing any damages they claim within 30 days of this order. Toward that end plaintiffs are ordered to make any requests for an accounting from defendants, designating the relevant periods of time for computing damages, by January 21, 1983, and defendants are ordered to respond to these requests by February 18, 1983.

SO ORDERED.